[S.F. No. 22957. In Bank. Oct. 9, 1973.]

DANIEL MARK SIEGEL, Petitioner, v.
COMMITTEE OF BAR EXAMINERS, THE STATE BAR OF
CALIFORNIA, Respondent.

**COUNSEL**

Marshall W. Krause, Treuhaft, Walker & Burnstein, Malcolm Burnstein, Garry, Dreyfus, McTernan & Brotsky, Francis J. McTernan, Barry Winograd and Doron Weinberg for Petitioner.

Charles C. Marson and Peter E. Sheehan as Amici Curiae on behalf of Petitioner.

Kenneth D. McClosky and Samuel L. Holmes for Respondent.

**OPINION**

**THE COURT.**—Daniel Mark Siegel seeks review of the action of the Committee of Bar Examiners of the State Bar in refusing to certify him to this court for admission and a license to practice law in California. (Bus. & Prof. Code, § 6066; Cal. Rules of Court, rule 59.)

Petitioner graduated from the School of Law of the University of California at Berkeley in 1970. He took and passed the bar examination given general applicants in August 1970. However, he was not certified to this court for admission because respondent Committee of Bar Examiners of

the State Bar (Committee) was not satisfied that he was of the "good moral character" requisite for certification. (Bus. & Prof. Code, § 6060, subd. (c); Rules Regulating Admission to Practice Law, rule II, § 22, rule X, § 101.)

Respondent Committee caused a three-member subcommittee to be established in order to make an investigation into petitioner's moral character. Hearings were conducted by the subcommittee on five different dates, commencing May 19, 1971. Petitioner was present with counsel at these hearings, and the sworn testimony of 11 witnesses, including petitioner, was taken by the subcommittee. Some six months after the conclusion of these hearings the subcommittee issued its report, findings, conclusions and recommendations in which it was concluded that petitioner was not a person of good moral character within the meaning of section 6060, subdivision (b) of the Business and Professions Code and recommended that petitioner not be certified to this court for admission to practice.

On May 20, 1972, respondent Committee at petitioner's request convened a hearing at which petitioner appeared with counsel and answered questions put by the Committee members. No other evidence was taken at this time and the matter was submitted at the conclusion of the hearing.

On June 28, 1972, respondent Committee issued its findings of fact, conclusions of law, and decision which, by a vote of five to two, concluded that petitioner "[was] not possessed of good moral character in that he does not possess the requisite qualities of honesty, fairness, candor and truthfulness which are an essential part of fitness to practice law and requisite for this Committee's certification."[1] This conclusion and the consequent denial of certification were based upon a factual finding that petitioner had lied under oath to the subcommittee and to the Committee at the hearings before them with regard to the meaning and intended effect of certain utterances made by him in the course of three speeches delivered in 1969 and 1970.[2]

---

[1] As amended to June 21, 1972, rule X, section 101 of the Rules Regulating Admission to Practice Law provides: "The term 'good moral character' includes qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, of the laws of the state and the nation and respect for the rights of others and for the judicial process."

[2] The specific language of the crucial finding was: "During the course of his testimony before the Subcommittee and the Committee . . . Applicant lied under oath to the Subcommittee and to the Committee with regard to several material matters, as evidenced by his demeanor before the Subcommittee and Committee, by his evasive answers, and 'by the incredible and unbelievable 'explanations' of uncontroverted

In accordance with our duty to undertake an independent examination. of the evidence in cases of this kind (see *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 450-451 [55 Cal.Rptr. 228, 421 P.2d 76], and cases there cited; *March* v. *Committee of Bar Examiners* (1967) 67 Cal.2d 718, 720 [63 Cal.Rptr. 399, 433 P.2d 191]; *Bernstein* v. *Committee of Bar Examiners* (1968) 69 Cal.2d 90, 97 [70 Cal.Rptr. 106, 443 P.2d 570]), we proceed to a consideration of the record.

## I

### The Applicant's Prima Facie Case

"Under the Rules Regulating Admission to Practice Law the burden of proving good moral character is upon the applicant. (Rule X, § 101; see also *In re Garland,* 219 Cal. 661, 662 [28 P.2d 354]; *Spears* v. *State Bar,* 211 Cal. 183, 188 [294 P. 697, 72 A.L.R. 923].) Pursuant to this rule the applicant must initially furnish enough evidence of good moral character to establish a prima facie case, and the committee then has the opportunity to rebut that showing with evidence of bad character. (*Konigsberg* v. *State Bar,* 366 U.S. 36, 41 [6 L.Ed.2d 105, 111, 81 S.Ct. 997].)" (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 449-450, fn. 1.) In the instant case petitioner presented to the subcommittee and the Committee ample evidence to establish a prima facie showing of good moral character. Because this evidence (all of which is uncontradicted) is relevant to our overall determination[3] we set forth a summary of it below.

(1) *Scholarly Achievements.* Petitioner attended high school in New York, graduating second in his class. He was elected to the National Honor Society and received several scholarships, among them a New York State Regents Scholarship and a scholarship from Hamilton College in New York, which he subsequently attended. Petitioner graduated *magna cum laude* from Hamilton, with a grade average of approximately 95, and was awarded department honors from the department of religion. He was offered law

---

statements made by Applicant in his speeches, particularly in the light of the circumstances in which such speeches were made, the audiences addressed, and Applicant's tone of voice in the speeches which were tape recorded, the cumulative effect of all of which convinced the majority of the Committee members and all members of the Subcommittee that Applicant was not honest and candid in his sworn testimony to the Subcommittee and the Committee."

[3]Fundamentally, the question before us is that which was before the Committee: Is the applicant a fit and proper person to be permitted to practice law in California? (See *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 453.)

school scholarships at the University of Chicago and the University of California (Boalt Hall) and chose the latter. Following graduation he passed the bar examination and was awarded a Reginald Heber Smith Community Law Fellowship for work with the Legal Aid Society of Alameda County.

(2) *Civic Activities.* Prior to graduation from high school petitioner was active in the Boy Scouts of America, attaining the rank of Life Scout and serving as a junior assistant scout master. During the summer of his sophomore year in college he worked as a volunteer in a YWCA-sponsored project in Raleigh, North Carolina, involved in voter registration and a survey of social needs in the black community there. Later the same summer he worked as a paid counselor in a home for delinquent teenagers sponsored by the Lutheran Church in Utica, New York. The following year he entered a competition sponsored by the Wall Street Journal Newspaper Fund for students interested in journalistic activities, and he was one of 50 persons nationally to win a fellowship. He was placed with a newspaper in Quincy, Massachusetts, and he worked there that summer and the summer following, the latter term as a full-time staff reporter assigned to cover local political and civic affairs. In the course of this work he wrote a feature story on a program designed to train young people to be of assistance to the blind, and for this story he received a commendatory letter from the Massachusetts Association for the Blind. The same summer—that of 1967—petitioner helped organize a drive in the Boston area to collect food, clothing, and money for the relief of victims of the massive civil disorders in Detroit. At the conclusion of the summer petitioner was made an honorary citizen of Quincy by mayoral proclamation. With his entry into law school, petitioner began to undertake activities which, while broadly speaking might be classified "civic," were more specifically of a legal or political nature. These will therefore be discussed below. It seems appropriate, however, to mention at this point that in the spring of 1969 petitioner was elected to the presidency of the Associated Students of the University of California at Berkeley.

(3) *Legal Activities.* Soon after entering law school petitioner became active in the Boalt Hall Community Assistance Program, an organization within the school which sponsored various projects involving student participation in the legal process—projects ranging from student assistance for attorneys engaged in certain aspects of poverty and criminal law to the development of an "own recognizance" release program in the Oakland-Berkeley area. In the spring of his first year petitioner became the director of this organization and was instrumental in the development of a project

in which law students and medical students were sent to assist lawyers and doctors involved in community service projects in the San Joaquin Valley. During the same period he was head of the Boalt Hall chapter of the Law Students Civil Rights Research Council, a national organization of some 70 chapters whose function is to recruit law students to assist attorneys and organizations in civil rights and poverty-related work around the country. The following school year petitioner participated in a weekend colloquium organized by the faculty of the law school and the California Law Review pertaining to revisions in the legal curriculum, and in that connection he and two other students prepared and presented a proposal that the first-year program include more intensive courses in the philosophy and sociology of law in addition to the traditional subjects and that the second and third year include "apprenticeship" or practical training in the field of particular interest. During that year petitioner was also elected to the position of Student Advocate of the Associated Students, the function of which is to provide counsel for students involved in university disciplinary proceedings and he represented many such students in that capacity.[4] The following summer he was himself awarded a fellowship

[4]Among the many letters of recommendation introduced as exhibits before the Committee were two from the professor who was chairman of the Faculty Committee on Student Conduct when petitioner occupied the position of Student Advocate. These letters, while reflecting certain philosophical differences between the writer and the applicant, are expressions of commendation by one who occupied a peculiar position to judge petitioner's legal abilities and qualities of character. The first of these, a letter of recommendation for the Reginald Heber Smith program, stated: "I think I am being fair to Mr. Siegel when I say that he is a radical of fairly devoted persuasion. I am not. So his goals included a good many things that I do not advocate, and his views accept some methods which I wholly reject even when the goal in question is one we share. [¶] I mention these things only to preface a statement that despite these rather fundamental differences. I have a high admiration for his qualities as a lawyer. I first came to know him early in his first year in law school, when the inventive qualities of his mind were made apparent by his unwillingness to learn the law as gospel. The next year we had a different relationship. I was Chairman of the Faculty Committee on Student Conduct on campus, and he was Student Advocate, charged with defending students appearing before our committee on charges of violation of University regulations. To say that I was impressed by his performance was to understate the case. He did a better job for his clients than most of the seasoned practitioners who appeared before us did. Despite his general alliance with their cause, he walked a very delicate line between supporting the cause and acting in the best interests of his individual clients. And I quickly learned that his word was absolutely dependable—if he said that something had happened, or would happen, it could be accepted without question. . . . [¶] I have every confidence that Siegel will be a top quality lawyer and an absolutely first class litigator. In my experience, described above, he is able to put to one side his political views when they interfere with the lawyer task at hand. And his pure lawyer capacities, I repeat, are impressive." The second letter, to the Committee itself, was candid to admit that the writer did not know whether he, if a member of the Committee, would vote for petitioner's

by the Law Students Civil Rights Research Council and assigned to work with attorneys in two bay area law offices. After graduation in 1970, as already noted above, petitioner was awarded a Reginald Heber Smith Community Law Fellowship to work with the Legal Aid Society of Alameda County, and he remained in that position for one year.[5]

(4) *Political Activities.* Although it might be said that petitioner has been engaged in political activity for a considerable portion of his life, he became most visibly so engaged following the spring of 1969, when he served as Student Advocate and was elected to the presidency of the Associated Students of the University of California. Putting to one side for the moment the events of 1969 and 1970 which form the focus of this proceeding, we note that the record contains numerous examples wherein petitioner's political beliefs, "radical" though they might be termed, gave rise to political action within the structures of the democratic process. Perhaps the most conspicuous of these occurred during the period extending from the spring of 1970 up until the time of the subcommittee hearings. During this period petitioner, as "president"[6] of the Associated Students and with the sanction of the faculty and administration of the university, was instrumental in channeling student concern and outrage stemming from the invasion of Cambodia by American forces and the subsequent Kent State incident into political action of the traditional electoral variety.[7]

---

admission—but again the matter of honesty was emphasized: "Siegel represented most of the people who appeared before us. I would not [say] that he never put into the record evidence that was flatly false, but he never did vouch for testimony that was false. I have in my time dealt with many a trial lawyer, and I have never had occasion to doubt Siegel's word when it was given."

[5]Four letters of recommendation were submitted to the Committee by attorneys at the Alameda County Legal Aid Society—two from petitioner's "supervising lawyers" there (see State Bar Rules Governing the Practical Training of Law Students). All of these letters were highly commendatory of petitioner's legal competence and ethical standards, and each emphasized his dedication to achieving social change within the structure of the legal system.

[6]Although petitioner was elected to the presidency in the spring of 1969, he was not to take office until the fall term. In the interim there occurred incidents to be discussed below and petitioner was placed on disciplinary probation by the university administration. Because one in that status could not hold the office of president, petitioner was never formally installed. However, no other person was installed in his place. On many occasions during what would have been his term as president, petitioner functioned as *de facto* president, in some cases with the implicit sanction of the administration.

[7]A letter of recommendation dealing with this subject was sent to the Committee by Alan Cranston, the senior United States Senator from California. The full text of this letter was as follows: "I understand that the Committee is reviewing the application of Dan Segal [*sic*] for admission to the bar. I would like to recommend Mr. [Siegel's] admission on the basis of work we did together during the period before and after he became president of the University of California student body. [¶] Mr. [Siegel's] cooperation with my office in attempting to prevent violence at the Uni-

Furthermore at this time petitioner played a major part in the formation of an electoral organization known as the April Coalition which was ultimately successful in achieving the election of several candidates to the Berkeley City Council in 1971.

## II

### *The Evidence and the Findings*

It is clear from the foregoing that petitioner made out a prima facie case of good moral character before the Committee. We therefore now examine the evidence of bad moral character upon which the Committee based its findings, conclusions, and decision refusing certification.[8] "Such evidence may result from the Committee's own independent investigation, from an applicant's responses to questions on his application form, or from Committee interrogation of the applicant himself. This interrogation may well be of decisive importance for, as all familiar with bar admission proceedings know, exclusion of unworthy candidates frequently depends upon the thoroughness of the Committee's questioning, revealing as it may infirmities in an otherwise satisfactory showing on his part." (*Konigsberg* v. *State Bar* (1961) 366 U.S. 36, 41-42 [6 L.Ed.2d 105, 111, 81 S.Ct. 997].)

In the instant case it was indeed the interrogation of petitioner by the members of the Committee that was of decisive importance, for the crucial finding of the Committee (over the dissent of two of its members) was that petitioner had lied to it and to the subcommittee. (See fn. 2, *ante,* and accompanying text.) The subject matter relative to which lying was found to have occurred consisted of three speeches made by petitioner in 1969 and 1970 in which petitioner, in the view of the Committee (again apparently over the dissent of two members), "advocated unlawful violence and unlawful violent conduct," but the conclusion and decision of the Committee that petitioner was not of good moral character was not squarely based on the fact of such advocacy. Rather it was based upon the fact that

---

versity of California during last year's Cambodian crisis is especially praiseworthy. After the Cambodian invasion occurred, there was substantial fear that student protest in various areas of the country would turn into violence. Many of my constituents expressed special concern about the situation at Berkeley. I consulted with Mr. [Siegel] and expressed the concern of these constituents. Thereafter he played a major role in preventing the eruption of violence at Berkeley in protest over Cambodia. He helped channel student protest into constructive areas such as political action. Students participated in registering voters and supporting candidates with their political convictions. [¶] I believe Mr. [Siegel's] hard work on these projects should commend him for admission to the bar."

[8]Because the Committee did not adopt the findings of the subcommittee but issued its own findings, we limit our consideration to the findings of the Committee.

petitioner, when testifying before the Committee and subcommittee, denied or refused to admit that he had advocated violence in any of the three speeches in question. The Committee, concluding as it did that petitioner *had* advocated unlawful violence in each of the three speeches, found that petitioner's refusal to admit that fact constituted lying and denied certification on that basis.[9] We turn to the evidence in order to determine whether that finding was correct.

### (1) *The Speeches*

(a) *May 15, 1969.* As indicated above, petitioner was elected president of the Associated Students in the spring of 1969. Shortly after his election there developed and occurred what has come to be known as the "People's Park incident." South of the main campus was a parcel of real property, bounded by Dwight Way and Bowditch and Haste Streets, which was owned by the university but had not yet been put to any specific use. Certain residents of the south campus area, both students and non-students, concluded that more recreational space was needed in the area and determined to develop this parcel by their own efforts as a park and playground. Apparently no authorization from the university was sought or obtained, and as work on the project proceeded and popular support increased the stage was set for a confrontation between the proponents of the "park" and university authorities. The university newspaper, the Daily Californian, afforded substantial coverage to the problem, running stories not only concerning the progress being made on the park but also relative to the reaction which might be expected from the university administration.[10]

---

[9]That petitioner's alleged lying is the only basis for the Committee's refusal to certify him is made clear by the following passage from the Committee's memorandum in opposition to the petition for writ of review. "The record herein showed conduct and statements by petitioner which reasonably appeared to have only one meaning. Petitioner was given ample opportunity to explain them. If he had admitted their apparent meaning was correct or explained them in a credible way, adding extenuating circumstances, and had given evidence that, if he had advocated violence or unlawful conduct, he no longer did so, *he undoubtedly would have been certified.*" (Italics added.)

[10]Petitioner gave the following testimony before the subcommittee concerning newspaper coverage in the Daily Californian prior to May 15:

"Q. Would you state what you remember as the substance and effect of those stories? A. Well, they were basically, two kinds of stories. One kind of story described what was going on at the park, and enumerated the large numbers of people from campus and from the community who were working to build the park and donating playground equipment and shrubbery and plants, and their labor and skills to build it, and described the scenes which occurred each time when people would get together at the park and work, cooperatively, to fill in the holes and ruts there, and to plant things, and so forth. [¶] Then there was another series of stories which described the University's reaction to the park, which I can't remember if they were based upon

The matter had reached significant proportions of concern and controversy when, on May 13, 1969, the chancellor's office issued a statement announcing the readiness of the university to proceed with development of the site (as a soccer field), forbidding the presence of unauthorized persons, and advising that any equipment or other property left on the premises would be deemed abandoned. On or about May 14 "No Trespassing" signs were erected at the property, and on the morning of May 15 the university began to erect a high chain-link fence around its perimeters.

Petitioner, although he was sympathetic to the persons involved in the development of the park and had done some physical work on the project himself, had prior to May 15 taken a position contrary to certain alarmist elements in the student body and community by maintaining that the university had undertaken in private discussions to solve the problem by negotiation and discussion and would not resort to more dramatic means. When the fence was erected he felt he had been personally betrayed and made to look foolish.[11]

statements from the University administration, but which, generally, were to the effect that the people who liked the park were concerned that the University was going to stop people from using and developing the area. [¶] Q. Did the stories in the Daily Cal with respect to the University's position reiterate, in substance, the original statement issued from the Information Office, that is, that the University was going ahead with its plans, but that the University administration was willing to discuss the design of the field, and uses by the community, in general, and also to discuss the possibility of alternative sites for a park-like activity? [¶] A. I believe those types of statements were part of the stories. There were also, I believe, statements to the effect, from the University administration, that no action would be taken by the University administration in regard to the park without full consultation with the people involved in building it. [¶] Q. These stories continued nearly daily during the first couple of weeks of May, didn't they? A. Right. There were several scares, as it were—rumors flying around—that the University was going to put a fence around the park, or something to that effect. These occurred fairly frequently in the days, and perhaps weeks, preceding May 15th."

[11]Petitioner testified before the subcommittee on this point as follows: "Q. Had you been one of the persons who had been attempting to negotiate with the Chancellor about the matter of a fence? A. Not directly. Q. Why did you feel you had been taken in? A. Well, some of the people who were negotiating with the Chancellor were members of the Senate of the Associated Students, and, in my position at that time as Student Advocate of the Associated Students, and also as president-elect, I had engaged in some discussion with those people and, from what they told me, I felt that the University had given them and the community-at-large its word that this situation would be dealt with through negotiations and through discussion, and I had scoffed at the people who thought the University was going to come in in the middle of the night and put up a fence. I felt they were being foolish, and that the University would stand by its word. Q. Did you feel that the University, then, had challenged the people that it had purportedly been negotiating with? A. No, not challenged. I felt that it had shown its contempt for them, and its disregard of their opinions and their efforts."

At noon on May 15 a rally was held in Sproul Plaza on the university campus. Three to four thousand persons were present and heard a series of approximately nine scheduled speakers, each of whom addressed himself to the matter of the action which the university had taken with respect to the "park." Petitioner was present at the rally but was not a scheduled speaker. However he was persuaded by certain of the scheduled speakers that he, as president-elect, should address the assembly. This he did, delivering a short speech of considerable passion and vigor which accused the administration of duplicity and autocratic conduct in the affair and culminated with the following language: "Now, we have not yet decided exactly what we are going to do. But there are some plans, I have a suggestion, let's go down to the People's Park, because we are the people. But a couple of things, a couple of points I would like to make. If we are to win this thing, it is because we are making it more costly for the University to put up its fence, than it is for them to take down their fence. What we have to do then, is maximize the cost to them, minimize the cost to us. So what that means, is people be careful. Don't let those pigs beat the [* * * *][12] out of you, don't let yourselves get arrested on felonies, go down there and take the park."[13]

At the conclusion of this speech the rally terminated[14] and the crowd moved off toward the location of the "park," where by that time some 200 police were stationed. In the afternoon which followed, members of the crowd, which had then been augmented by persons not present at the rally, became involved in a series of violent clashes with police officers which resulted in the death of one person, the injury of many, and the

---

[12]Here and in the appendices, we employ asterisks to indicate petitioner's use of a word which we consider inappropriate to repeat in this opinion.

[13]The full text of the speech is set forth in Appendix A following this opinion.

[14]There was testimony by petitioner and another to the effect that the termination of the rally following petitioner's speech was due to the fact that the sound amplification system was shut off by university officials at that time. Petitioner testified that he expected that several more scheduled speakers would follow him and present specific plans for dealing with the situation. A tape recording made of the speech contains some marginally intelligible discussion, occurring immediately after the conclusion of the speech, between petitioner and others standing near the microphone— and it was argued by the Committee at oral argument before us that this demonstrates that the amplification system was not in fact shut off after petitioner's speech as he claims. However, petitioner testified without dispute that the recording was made not by recording the sounds produced by the loudspeaker but by means of a direct connection between the microphone and a tape recorder in the basement of the campus police station. This arrangement renders it clearly possible that recording continued even though the amplification system was no longer operative. Petitioner further testified that a tape made by someone standing near the loudspeaker, and admitted at the criminal trial which arose from the incident, did not contain the subject discussion. In short, the evidence on this point is inconclusive.

arrest of more than forty. The National Guard was summoned to the area the following day and remained there for a period of two weeks in order to assure the maintenance of order.

As a result of the events of May 15, 1969, petitioner was charged with violation of section 404.6, of the Penal Code, incitement to riot; he was acquitted of that charge after a jury trial. University disciplinary proceedings were also undertaken, with the result that petitioner was placed on disciplinary probation for one year.

(b) *March 6, 1970.* On this date petitioner addressed a large group of people in Provo Park, an open space across the street from the Berkeley City Hall. Petitioner himself had made arrangements for the meeting and had provided assurances of peaceful intentions, these apparently being required in light of a wave of sporadic destruction of private property which had troubled the Berkeley community in preceding weeks. Moreover, on the date of the speech the burning of a branch of the Bank of America near the university's Santa Barbara campus had but recently taken place.

Petitioner's speech, generally summarized,[15] began with a review of the evolution of the student movement in this country and a discussion of the tactics utilized at each stage in that evolution; it then proceeded to suggest that "the movement" was now entering a stage involving the acquisition of political power through traditional electoral means; it went on to announce that a series of meetings had been arranged for the purpose of achieving political consensus among the various factions and interests which made up "the movement" and then set forth several specific suggestions of the speaker concerning areas of mutual interest which could form the basis of a political platform; it concluded by adjuring the audience to attend the first meeting on the following day.[16] The opening portion of the speech— that dealing with the historical evolution of "the movement"—contained the following language:

"I think the movement, the movement as a whole in this country in the last ten years, has gone through a lot of stages, a lot of growing. When I was down South in Alabama in the 1960's, we were full of what I call naive idealism. We got a fellow down in Mississippi to sing a few songs, get a good laugh, and we just thought that, as nice groovy people, things

---

[15]An excerpted text of the speech is set forth in Appendix A following this opinion.

[16]Apparently the meetings in question led to the formation and eventual electoral success of the so-called April Coalition (see text following fn. 7, *ante*).

would change. But, we found out pretty quick that this is not the way to change things in this society. We found out that doing what's right is not enough, is not enough because there are people in this society who are making a lot of money from the way things are and they are not going to listen to us just because we go down South and sing freedom songs and hold our hands.

"Then, after that, we started getting into a new stage in the movement. I like to call this stage 'give them a little [* * * *] for the [* * * *] they are giving us.' That's what's been going on. That's what started in Berkeley when we had our first insurrection in the summer of 1968. That's what happened down in Santa Barbara in the last couple of weeks. It's called the 'give them a little [* * * *] for the [* * * *] they give us.' And, brothers and sisters, I am not going to get up here and tell you that in this society nonviolence is the way, because that's [* * * *], we know that. But just at the same time I am not going to tell you that non-violence is the way and we should avoid violence because it is bad or something like that, I am going to tell you this, that we have to be, as time goes on, as the [* * * *] comes down heavier and heavier in Babylon, we have to be a lot heavier about the kind of violence that we're going to perpetrate. We are going to have to talk about violence, if it's violence, the question is not nonviolence vs. violence, the question is when violence, and how violence and what violence, because, that is to say that to some of the people, some people think that any kind of violence is groovy and that goes along with the philosophy, give them [* * * *] for giving us [* * * *], which is the only philosophy we have. But I will say this, that the kind of oppression that is coming down in this country right now, we will have to do a little bit more thinking, a little bit more getting ourselves together. We gotta decide, for instance, the answers to these questions:

"1. What are we trying to accomplish in this country?

"2. How are we going to accomplish it?

"3. Who do we need to be on our side if we are going to accomplish it?

"4. How are we going to get them people on our side?

"What this means to me is though I can see very little objection theoretically, politically, or morally, or anything else, with burning down the Bank of America and all its 500 branches, I do think there is some problem with breaking windows of small store owners, and busting the windows of cars that belong to black people or white workingclass people. This is what we

need. I mean, there is a distinction there, there is a distinction between the people who own the Bank of America and the white workingclass man who is working for money and is exploited by the capitalist power structure in the country the same way that we are. If we're going to think about using violence, I think we have to direct it carefully because we need these brothers on our side.

"Now we know something about what's been happening here. Some people in Berkeley started to get together this week to discuss general problems and general policies. Now, I do not mean to say that people have gotten together and say they know all of the answers. But people have gotten together and say it is time to start asking these questions if they have not already been done before. It is time to think, not only about defending ourselves against repression, but it is time to think how we are going to reverse the power structure in this country so that it can be ours, so the power can belong to the people."

No disorder or acts of violence followed this speech.

(c) *April 15, 1970.* On this date an authorized rally was held at Sproul Plaza on the university. Fifteen hundred to two thousand persons were present and heard three scheduled speakers who addressed themselves, generally speaking, to the subject of United States involvement in the war in Indochina. Petitioner was the last of these speakers. His long and somewhat disjointed discourse[17] alternated self-castigation with accusation—on the one hand admonishing the audience and the student movement in general for imperfect perception, devotion and resiliency, and on the other excoriating the university, the national government, big business, the press, and various other seats of authority and power for ruthlessness, oppression, perfidy, and fascism. It ended with a plea for unity and the creation of a "mass movement" which would more effectively confront and defeat the enumerated forces of evil. Tying this general aim to events which had been scheduled for later in the day, petitioner concluded his speech with the following language, delivered in a tone of considerable passion: "O.K., I think that's enough rapping for now. What we're going to do now is move out of this place and get into making a start on the demonstrations to get rid of the war machine on this campus. We're going to get rid of the war machine on this campus starting right now. There's a banner toward Sather Gate. That banner is going to lead people on a march around this campus. First down to University Hall, everyone should go down to University Hall for a rally there, a rally there to protest counterinsurgency

---

[17]An excerpted text of the speech is set forth in Appendix A following this opinion.

in Thailand. And then to move on R.O.T.C. We've got to get this struggle going. We've got to get rid of R.O.T.C. Smash university complicity! All power to the people! Let's hear it. All power to the people! Smash R.O.T.C.!"

After petitioner's address the rally at Sproul Plaza terminated. A majority of the crowd followed the banner across the campus (a distance of between a quarter-mile and a half-mile, according to police testimony) to an area across the street from University Hall, where another rally of 15 to 25 minutes' duration occurred. Then the crowd moved in a less organized fashion to Callaghan Hall, the R.O.T.C. building, where they were met by approximately 12 university police officers. A violent confrontation ensued involving the hurling of missiles by the crowd and the use of tear gas by police.

As a result of the events of April 15, 1970, petitioner was charged with violation of section 404.6 of the Penal Code, incitement to riot; following a hearing on a defense motion pursuant to section 1538.5 of the Penal Code the evidence was found to be insubstantial and the case was submitted on the basis of the police report and the 1538.5 hearing transcript, the court returning a verdict of acquittal. The possibility of university disciplinary proceedings was considered, but none were undertaken.

(2) *Petitioner's Testimony.* Petitioner testified unequivocally before the subcommittee and the Committee that he had never advocated unlawful violence or violent conduct. He also gave specific testimony before both bodies to the effect that he had not advocated violence in any of the three speeches upon which the Committee focussed its attention. We here undertake to summarize his relevant testimony concerning each of the three speeches. In Appendix B, following this opinion, we set forth representative excerpts from petitioner's actual testimony before the subcommittee and the Committee.

(a) *May 15, 1969.* Petitioner testified that the language used by him in this speech was not a call to any particular action at all except insofar as it urged the crowd to move to the location of the park and peacefully demonstrate its opposition to the action taken by the university; that the concluding statement of the speech, urging the crowd to "go down there and take the park," was not a call to violence but a call to undertake the first phase of an ongoing demonstration of public disapproval which would hopefully result in the return of the "park" to those who had begun to develop it; and that it was not contemplated by him or any of the rally's organizers that petitioner's speech would conclude the rally but rather it

was expected that further speakers would come forward after petitioner with specific proposals for action. (See fn. 14, *ante.*)

(b) *March 6, 1970.* Petitioner testified that the thrust and intention of this speech, viewed as a whole, was to persuade his audience of the inefficiency of random violence as a response to their grievances and urge them to join him in massive political action within the context of the electoral system; that remarks made in the course of the speech indicating that violence was a permissible (albeit ineffective) alternative mode of action were made purely for the purpose of establishing rapport with the audience in order to render them amenable to persuasion; and that the result of the speech was not violence but on the other hand was the type of political action which petitioner advocated.

(c) *April 15, 1970.* Petitioner's testimony relative to this speech, very generally summarized, was that it was simply a part of a large demonstration directed against university involvement in the United States war effort in Indochina; that the phrase which culminated it ("Smash R.O.T.C.!") was not a call to violence but rather a rhetorical admonition, well understood by the audience, to mount a unified and effective demonstration of displeasure with the presence of R.O.T.C. on the university campus; and that in any event any causal connection between the speech and the violence which subsequently erupted at the R.O.T.C. building was attenuated by the fact that another demonstration took place after his speech and before the violence.

(3) *The Committee's Findings.* The Committee's essential finding of fact, based upon the foregoing evidence and testimony was: "[I]n his sworn testimony . . . before the Subcommittee . . . and in his sworn testimony before the Committee . . ., Applicant intentionally lied to the Subcommittee and to the Committee by testifying under oath that he had never advocated violence or violent conduct. The Committee finds that in the speech given by Applicant at Provo Park on March 6, 1970 . . ., in the speech given on Sproul Hall steps on April 15, 1970 . . ., and in the speech given on Sproul Hall steps on May 15, 1969 . . ., Applicant advocated unlawful violence and unlawful violent conduct."

The Committee's sole legal conclusion was: "Applicant is not possessed of good moral character in that he does not possess the requisite qualities of honesty, fairness, candor and truthfulness which are an essential part of fitness to practice law and requisite for this Committee's certification."

## III

The legal rules and principles which govern our inquiry in matters of this nature are well settled. ■ Although the findings of the Committee are entitled to and accorded great weight, we are not bound by them. Rather, this court independently examines and weighs the evidence and passes upon its sufficiency. The applicant bears the burden of showing that the Committee's findings are not supported by the evidence or "that its decision or action is erroneous or unlawful," but all reasonable doubts are to be resolved in his favor. (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 450-451, and cases there cited; see *March* v. *Committee of Bar Examiners, supra,* 67 Cal.2d 718, 720; *Bernstein* v. *Committee of Bar Examiners, supra,* 69 Cal.2d 90, 97.)

■ When the findings and recommendations of the Committee rest primarily on testimonial evidence we, relying on its better position to observe the demeanor of witnesses and the character of their testimony, must accord special deference to its decision. (*Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 790 [51 Cal.Rptr. 825, 415 P.2d 521].) However, this principle warrants greater emphasis with respect to issues as to which the testimonial evidence is in conflict than it does with respect to issues whose resolution depends on the inferences to be drawn from essentially undisputed facts. "If two or more equally reasonable inferences may be drawn from a proved fact, the inference leading to a conclusion of innocence rather than the one leading to a conclusion of guilt will be accepted." (*Id.* at p. 790.) Moreover, in cases where another qualified trier of facts has heard essentially the same evidence but has reached a conclusion contrary to that reached by the Committee with regard to a given issue, this court will discount the degree of reliance normally accorded the Committee's finding on that issue. (*Id.* at pp. 790, 800.)

The central question which we face and must consider in the light of the foregoing authorities lies at the heart of the Committee's findings: Did petitioner intentionally lie to the subcommittee and to the Committee by testifying under oath that he had never advocated unlawful violence? It is the Committee's affirmative response to this inquiry which constitutes the core of its conclusion that petitioner is not possessed of good moral character. In short, the Committee has determined that petitioner is not possessed of good moral character because he lied by testifying that he had never advocated violence whereas in fact he did advocate violence in his speeches. The structure of the findings thus dictate the framework of our analysis.

We start with some observations on the meaning of the word "lie" as used in the findings. To lie is "to make an untrue statement with intent to deceive." (Webster's New Internat. Dict. (3d ed. 1963) p. 1305.) Thus, the determination of whether a lie has been told comprehends an analysis having two aspects: (1) an objective aspect, which is concerned with whether an "untrue statement" has been made, and (2) a subjective aspect, which is concerned with the intent or state of mind of the person who utters such a statement. The first of these aspects logically precedes the second, for if there has been no untrue statement made, inquiry into the speaker's state of mind becomes irrelevant.

Applying this analysis to the instant case, we must ask the following questions: *First,* did petitioner utter an untrue statement when he testified that he had not advocated unlawful violence in any of the speeches we have considered? Or, to put the question more directly: Did petitioner advocate unlawful violence in any of the speeches? The *second* question, relevant *only if* the first is answered in the affirmative, is this: Did petitioner, when he made untrue statements in the course of his testimony (i.e., statements that he had not advocated unlawful violence) know that those statements were untrue and utter them with intent to deceive?

Before addressing ourselves to the substance of these questions we think it appropriate to comment upon the extent to which considerations touching upon First Amendment rights are inextricably involved in this proceeding. Although the findings of the Committee have been placed on a nonconstitutional footing, namely petitioner's credibility,[18] it is significant that his credibility has been found wanting only in respect to his explanation of the speeches which he gave.[19] The Committee did *not* conclude

---

[18]Although we are reluctant to read the Committee's mind on this point, it seems apparent that the determination to rest the denial of certification on petitioner's alleged lies rather than directly on the content of the speeches made by him was based upon the conclusion that those speeches lay within the ambit of constitutional protection and would not support a finding of bad moral character. The Committee's finding that the speeches advocated violence would not have been enough in and of itself to withdraw constitutional protection in the absence of an additional finding that "such advocacy [was] directed to inciting or producing imminent lawless action and [was] likely to incite or produce such action." (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447, fn. omitted [23 L.Ed.2d 430, 434, 89 S.Ct. 1827].) The speech of March 6, 1970, clearly did not fall within this category, and petitioner was acquitted of charges of inciting to riot with respect to the other two speeches in question.

[19]Not only has the charge of untruthfulness been unsupported by any instance independent of the speeches which form the focus of this proceeding (cf. *Barreiro* v. *State Bar* (1970) 2 Cal.3d 912 [88 Cal.Rptr. 192, 471 P.2d 992]), but the balance of the evidence before us offers strong support for a conclusion that petitioner's reputation for candor and truthfulness is good. (See fn. 4, *ante.*)

that petitioner was not possessed of good moral character because he advocated violence, but because he lied by testifying that he had never advocated violence in his speeches.

We admit to concern about the potential threat of such a procedure to the cherished right of free speech. If a prospective speaker knows that at some time in the future he may be called upon to interpret his remarks before a body concerned with his admission to professional status, and that such admission may depend upon his making an assessment of those remarks which agree with that made by the official body itself, he may well feel constrained to confine his public utterances to statements wholly free of ambiguous and provocative aspects. (Cf. *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 278-279 [11 L.Ed.2d 686, 705-706, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Speiser* v. *Randall* (1958) 357 U.S. 513, 526 [2 L.Ed.2d 1460, 1472-1473, 78 S.Ct. 1332].)[20] The inevitable result would be a dampening of the vigor of spoken expression inconsistent with our "profound national commitment to the principle that debate on public

---

[20]In the *New York Times* case, which involved the alleged libel of a public official, it was contended that the state's "per se libel" rule—which permitted the award of damages for libel in the absence of a showing of actual malice—was cured of constitutional infirmity by the fact that the defense of truth was available to the defendant. The high court, rejecting this contention, drew a parallel to *Smith* v. *California* (1959) 361 U.S. 147 [4 L.Ed.2d 205, 80 S.Ct. 215] wherein it was held that proof of guilty knowledge was necessary to a valid conviction of possession of obscene books for sale because a contrary rule would tend to restrict a bookseller's inventory to books which he has inspected and thereby would unduly restrict public access to the printed word. Applying this principle to the case before it, the *New York Times* court stated: "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 'steer far wider of the unlawful zone.' *Speiser* v. *Randall, supra,* 357 U.S., at 526." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 279 [11 L.Ed.2d 686, 706].)

In the *Speiser* case the high court invalidated a state procedure whereby applicants for veterans tax exemptions bore the burden of producing evidence and proving that they did not advocate violent overthrow of the government or support of a foreign government in case of hostilities. The court stated: "The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens." (*Speiser* v. *Randall, supra,* 357 U.S. 513, 526 [2 L.Ed.2d 1460, 1473].)

issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 270 [11 L.Ed.2d 686, 701].)

On the other hand it is obvious that the mere assertion that one is exercising or has exercised his right of free speech does not automatically clothe the speaker with full and perpetual immunity from an obligation to explain what he has said. Indeed we can conceive of many situations where an inquiry into the exercise of the right to speak is justified, as it is in the instant case, by need for an appropriate public or professional body to ascertain the true meaning of the language used by the speaker. (Cf. *Konigsberg* v. *State Bar, supra,* 366 U.S. 36, 44-47, 51 [6 L.Ed.2d 105, 112-115, 117].) It is the proper accommodation of these competing considerations which must concern us here.

We have concluded that a just and constitutional reconciliation between the transcendent values of free expression and the legitimate needs of official inquiry in this area is effected by the principles of interpretation applicable to cases of this kind. Those principles, as we have explained, require that when two or more reasonable inferences may be drawn from proved facts, the inference favoring the applicant must be accepted. In the context of the instant case such principles indicate that petitioner, although he continues to bear the burden of showing that the Committee's findings were without support or its decision or action erroneous or unlawful,[21] will have discharged that burden if it is shown that there is a reasonable basis for concluding that he was not lying when he characterized the thrust and meaning of his speeches as he did before the Committee. That showing will in turn be achieved if it is made to appear, according to the bipartite analysis of the concept of "lying" which we have enunciated, *either* (1) that there exists some reasonable basis for concluding that petitioner's speeches did not advocate unlawful violence, *or* (2) that if there is no such reasonable basis, there is nevertheless a reasonable basis for concluding that petitioner, when he testified that the speeches did not

---

[21]We conceive that the accommodation we here adopt, insofar as it ameliorates any danger of prior restraint on constitutional freedoms of expression, renders unnecessary a consideration of the alternative approach adopted in *Speiser* and advocated by Chief Justice Traynor in *Konigsberg* v. *State Bar* (1959) 52 Cal.2d 769, 774-778 (dissenting opinion) [344 P.2d 777]. That approach, which would shift the burden of proof to the Committee on issues relating to free speech but allow it to remain on the applicant on other issues, would in our view introduce an element of complexity into these proceedings which would be unwarranted in light of the existence of the present alternative.

advocate unlawful violence, did so innocent of an intent to deceive the Committee.

 Our independent examination of the entire record in this case[22] convinces us that petitioner has discharged the described burden and that, being qualified in all respects, he is entitled to be admitted to practice law.

Turning first to the initial inquiry made relevant by the above analysis, we are satisfied that there is a reasonable basis for concluding that none of petitioner's speeches in fact advocated unlawful violence. It bears emphasis that, under the principles we have enunciated, we need not and do not decide whether the speeches or any one of them actually *did or did not* advocate unlawful violence—rather our inquiry extends only to the questions *whether it could be reasonably maintained* that they did not. This question we answer in the affirmative. Looking to the texts of the speeches themselves, as well as to uncontradicted evidence concerning the setting in which they were delivered,[23] we think that in each of the three cases in question it might reasonably be argued that petitioner was not advocating that his audience engage in acts of unlawful violence. One articulation of such an argument lies ready to hand: petitioner's own testimony before the subcommittee, which we consider here in its interpretive rather than its substantive aspect,[24] is in our view not of a character which compels unqualified acceptance, but nevertheless it is not so wholly lacking in rational integrity that it fails to provide a reasonable basis for its acceptance. To state the matter differently, whatever our conclusion might be on the question whether the speeches actually *did or did not* advocate unlawful violence, our view of the uncontradicted evidence leads us to conclude that a finding favoring petitioner would rest on a reasonable basis therein— such a basis being suggested by petitioner's testimony itself.

We also consider it significant that with regard to the two speeches which were in fact followed by unlawful violent acts, criminal proceedings

---

[22]Our examination extends to the speeches themselves, the circumstances in which they were given, and the other relevant testimony in the record.

[23]We emphasize that the record is not wholly free from conflict concerning the setting and background of the individual speeches. (See fn. 14, *ante*.) It is fair to say, however, that there is no conflict in the evidence on any material fact of appreciable significance.

[24]Our consideration of petitioner's testimony in this regard is analogous to the consideration of parole evidence in order to disclose latent ambiguity in a written instrument. (See *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

initiated against petitioner for violation of section 404.6 of the Penal Code were concluded in his favor. ██ Although the termination of criminal proceedings in favor of a defendant attorney or applicant does not preclude State Bar action based upon the subject matter of those proceedings, even when the issues in both proceedings are identical (*Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 790-791, fn. 1; *Best* v. *State Bar* (1962) 57 Cal.2d 633, 637-638 [21 Cal.Rptr. 589, 371 P.2d 325]),[25] it cannot be gainsaid that such termination is entitled to very serious consideration in any subsequent proceedings relating to the specific events involved in the criminal proceedings. ██ We need not here decide whether such terminations, in the circumstances of the instant case, would be sufficient *in and of themselves* to sustain petitioner's burden relative to the speeches which they concern. It is enough to note that they form a part of the totality of circumstances which leads us to conclude that the burden has been sustained.

Because we have determined that there is in this record a reasonable basis for a conclusion that none of petitioner's speeches advocated unlawful violence, it is not necessary that we reach the second question set forth in our analysis—namely whether, having been found to have made false statements, petitioner did so knowingly and with an intent to deceive. Accordingly, we do not consider that matter here.

To summarize our holding: Although the applicant in a case of this nature continues to bear the burden of showing that the Committee's findings were without support or its decision or action erroneous or unlawful, the rules of interpretation governing all stages of admission proceedings, applied in the light of constitutional principles touching upon the free exercise of First Amendment rights, require a test for the discharge of that burden which is sternly weighted in favor of the applicant in cases of this kind. Such a test is especially needed when, as here, the sole ground for refusal of certification is the Committee's conclusion that the applicant's testimonial assessment of the meaning of his previous public utterances is not only untrue but mendacious. The test which we adopt and apply today insures that the denial of certification in such a case can be upheld only if it be concluded *beyond any reasonable doubt* that the applicant's version

---

[25]The cited cases were disciplinary proceedings, not admission proceedings, but the rationale expressed in them is equally applicable to admission cases. "The reasons for not applying a rule of res judicata are that the parties are different, the quantum of proof required is different, and 'the purposes of the two proceedings are vastly different. A criminal proceeding has for its purpose the punishment of the accused if he is found guilty. A disciplinary proceeding against an attorney is not intended for his punishment, but is for the protection of the public, the courts, and the legal profession.' " (*Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 790-791, fn. 1.)

not only is objectively false but has been advanced by him with an intent to deceive the Committee.

This we cannot conclude in the instant case. Rather we have concluded that there is in fact a reasonable basis to support a finding that petitioner, as he testified, did not advocate unlawful violence in his speeches; given this, it is not necessary that we address ourselves to the further question of petitioner's intent in testifying as he did before the Committee. Above all it is not necessary that we reach the issue which the Committee placed at the core of its inquiry—to wit, whether petitioner *did in fact* advocate unlawful violence in his speeches. It is enough to say that petitioner's interpretation of those speeches, viewed along with the speeches themselves and the circumstances in which they were given, is not so far beyond the pale as to be lacking any basis in reason. Beyond this we need not go.

We must observe in closing that our decision has not emerged from a process wholly free of troublesome aspects. We recognize that petitioner's political and social views as exposed by the record may not be shared by many members of the bar or by the community as a whole. His speeches and his testimony explanatory of them are in many places confusing, rambling, and difficult to grasp. While given in a setting redolent of youth's involvement with the deep and disturbing moral questions before the country, the speeches frequently deteriorate into sheer rant. To a great extent they have not been illuminated by petitioner's explanations before the Committee—equally convoluted and rambling and in places almost smugly pedagogic in their apparent attempt to educate the Committee on the vagaries of petitioner's political life-style.

These considerations, however, can in no way cause us to swerve from our responsibility to apply what we deem to be clearly controlling principles of constitutional and decisional law. For in the last analysis it is not the admission of Daniel Siegel to the State Bar which is at stake; rather it is the continued existence and vitality of those precious rights of which Chief Justice Hughes spoke 40 years ago: "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." (*De Jonge* v. *Oregon* (1937) 299 U.S. 353, 365 [81 L.Ed. 278, 284, 57 S.Ct. 255].)

The only possible afterword is that of Judge Learned Hand: "To many this is, and always will be, folly; but we have staked upon it our all." (*United States* v. *Associated Press* (S.D.N.Y. 1943) 52 F.Supp. 362, 372.)

It is ordered that the Committee of Bar Examiners certify petitioner Daniel Mark Siegel to this court as one qualified to be admitted to practice law.

McComb, J., dissented.

### Appendix A[1]

(1) *Sproul Plaza: May 15, 1969.* Let everyone be clear who is responsible for what is going to happen over the People's Park. For those who don't remember, the People's Park seven months ago was a dirty, muddy, vacant lot and remained that way and remained open to anyone, University sticker on their car or not, who wanted to park there. The University was satisfied for seven months to let people use that land.

A few weeks ago some other people decided there was a better way to use that land. They knew that the City of Berkeley and the University have been doing absolutely nothing to provide recreational space for the south campus area, and they built a park. After they started to work on the park, the University administration decided that they would have to make a response, because, as Mike Lerner said, one thing Roger Heyns does not want you to do is to think that you can have control over your own lives.

Roger Heyns said, the park is mine, it is still mine by any means necessary. Roger Heyns and the rest of the administration have gotten together and decided that they had to come up with a cheap way to use that land so they could justify pushing the people out. They had originally bought that land, you know, to put dormitories on it but they do not have the funds to build dormitories and they had been, until the people started building the park, content to let other people use it as a parking lot.

The new scheme, as you know, is to build a soccer field. A soccer field that is not wanted by students here, is not wanted by people in the community, and is not needed on the south campus area. There is a big field between Channing and Haste and that field is usually empty. There are also fields to the side and behind the Hearst gymnasium, those fields are usually empty. There is another field on the other side of the men's gymnasium and that field is usually empty. And if the University thinks that we need more damn soccer fields, they have purchased plenty of land on the north side where there are no other fields where they could build a soccer field.

So let it be clear who is causing the confrontation, who wants to show that he is boss, it is Roger Heyns. What people have to do is get themselves together to decide for themselves that they are not going to allow their lives to be ruled by Roger Heyns and the rest of those bums who escaped down to U.C.L.A. Thursday and Friday so they wouldn't have to be here to face the people.

And to show the lengths to which they are prepared to go, Roger Heyns invited me to go to the Regent's meeting with him this Thursday and Friday. But I told

[1]The following excerpted text of petitioner's speeches has been prepared by the court from the tape transcriptions thereof which were submitted as exhibits. The written transcripts of the speeches, also submitted as exhibits, were found to be inaccurate in certain minor respects.

Roger Heyns that I thought there were more important things to be doing in Berkeley, so I didn't go.

Now, we have not yet decided exactly what we are going to do.[2] But there are some plans. I have a suggestion, let's go down to the People's Park, because we are the people. But a couple of things, a couple of points I would like to make. If we are to win this thing, it is because we are making it more costly for the University to put up its fence, than it is for them to take down their fence. What we have to do then, is maximize the cost to them, minimize the cost to us. So what that means, is people be careful. Don't let those pigs beat the [* * * *] out of you, don't let yourselves get arrested on felonies. Go down there and take the park.

(2) *Provo Park: March 6, 1970.* Power to the people. I'm feeling serious tonight. I think this is an important night for us. Things are getting very heavy and there's a lot of [* * * *] coming down. We have the Chicago conspiracy trial going on the last couple of weeks, we find Fred Hampton murdered and a lot of efforts made to exterminate the Black Panther Party all over the country during the last few weeks. We got a government in Washington that doesn't even' make any pretense any more about making efforts to eliminate poverty, racism; in fact, they kind of pat a bunch of people on the back down in South Carolina when they attacked a bunch of little kids with axe handles and turned their bus over. It all appears to me, brothers and sisters, that this has got to be a new time for us, a time when we get our [* * * *] together better than we got it together in the past. Let me tell you what I mean by that.

I think the movement, the movement as a whole in this country in the last ten years, has gone through a lot of stages, a lot of growing. When I was down South in Alabama in the 1960's, we were full of what I call naive idealism. We got a fellow down in Mississippi to sing a few songs, get a good laugh, and we just thought that, as nice groovy people, things would change. But, we found out pretty quick that this is not the way to change things in this society. We found out that doing what's right is not enough, is not enough because there are people in this society who are making a lot of money from the way things are and they are not going to listen to us just because we go down South and sing freedom songs and hold our hands.

Then, after that, we started getting into a new stage in the movement. I like to call this stage "give them a little [* * * *] for the [* * * *] they are giving us." That's what's been going on. That's what started in Berkeley when we had our first insurrection in the summer of 1968. That's what happened thereafter, that's what's happened down in Santa Barbara in the last couple of weeks. It's called the "give them a little [* * * *] for the [* * * *] they give us." And, brothers and sisters, I am not going to get up here and tell you that in this society nonviolence is the way, because that's [* * * *], I am not going to tell you that nonviolence is the way and we should avoid violence because it is bad or something like that. I am going to tell you this: that we have to be, as time goes on, as the [* * * *] comes down heavier and heavier in Babylon, we have to be a lot heavier about the kind of violence that we're going to perpetrate. We are going to have to talk about violence. If it's violence, the question is not 'nonviolence vs. violence, the question is when violence, and how violence and what violence, because, that is to say that to some of the people, some people think that any kind of violence is groovy and that goes along with the philosophy, give them [* * * *] for giving us [* * * *], which is the only philosophy we have. But I will say this, that the kind of oppression that is coming down in this country right now, we will have to do a little more thinking,

---

[2]The tape transcription of the speech reflects that at this point members of the audience said: "That's not true, Dan." The significance of this utterance was considered by petitioner in his testimony before the Committee. (See Appendix B.)

a little bit more getting ourselves together. We gotta decide, for instance, the answers to these questions: 1. What are we trying to accomplish in this country? 2. How are we going to accomplish it? 3. Who do we need to be on our side if we are going to accomplish it? 4. How are we going to get them people on our side?

What this means to me is though I can see very little objection theoretically, politically, or morally, or anything else, with burning down the Bank of America and all its 500 branches, I do think there is some problem with breaking windows of small store owners, and busting the windows of cars that belong to black people or white workingclass people. This is what we need. I mean, there is a distinction there, there is a distinction between the people who own the Bank of America and the white workingclass man who is working for money and is exploited by the capitalist power structure in the country the same way that we are. If we're going to think about using violence, I think we have to direct it carefully because we need those brothers on our side.

Now we know something about what's been happening here. Some people in Berkeley started to get together this week to discuss general problems and general policies. Now I don't mean to say that people have gotten together and say they know all of the answers. But people have gotten together and say it is time to start asking these questions if they have not already been done before. It is time to think, not only about defending ourselves against repression, but it is time to think how we are going to reverse the power structure in this country so that it can be ours, so the power can belong to the people.

Now, again, it's a lot easier to say that than it is to say I got the answers, because I don't have the answers, but at least some people are starting to say that we have to get together, and even if we have to get together and pound the [* * * *] out of each other for three days straight, we should do that until we can come up with the kind of program we can all agree on. We are going to start off on this tomorrow morning, that's the first thing I want to tell you about. Tomorrow morning at eleven o'clock on the University of California campus we are going to start to get together people who have some interest in seizing power in this community, in their community, Berkeley, to begin to work out a program to do exactly that. I say that because it is my opinion and it is the opinion of other people in town that we have enough people in this town to make the power ours. We have enough people in this town, if we get our [* * * *] together and get ourselves together so that we don't have to put up with the kind of [* * * *] that comes down here and the kind of [* * * *] that people in other places have to put up with. We don't have to put up with it, right?

Now, what I've run down so far is the idea of agreement, the idea of agreement of people who are talking, you know who that is. We'll have to get together and start talking about what we can do. No one's got any agreement about what has to be done, we just agree that we have to get together. [*At this point in his address petitioner undertook to set forth at some length some personal suggestions concerning goals which might be achieved through community political action. Among those suggestions were (1) organized support of a rent strike then in progress, (2) community control of the police, (3) organized support of environmental efforts, and (4) eventual control of the existing city government through electoral means. In closing, petitioner offered a testimonial to the inspiration which he had gained through a meeting with representatives of North Vietnam which he had attended in Canada. Extolling his audience to take a lesson in dedication from this, petitioner ended his address as follows:*] And what I say to you, brother and sisters, is that power belongs to the people, the people of Berkeley, to get themselves together in the same way. Is it true? And if it is true, let's get a group together from all parts of

the city who are interested in revolutionary change in our city and throughout this country. We'll hassle with it at eleven o'clock tomorrow morning. Power to the people!

(3) *Sproul Plaza: April 15, 1970.*

Well, here we are again, and things look, things look kind of quiet, kind of down here today. There's a war going on, Bobby Seale's in jail, people are about to be evicted in the Tenants' Union. We don't have much spirit, we certainly don't have much revolutionary spirit here. Let's hear some noise. All Power to the People! Free Bobby Seale! No evictions! No R.O.T.C.! War research off campus! Close L.R.L. [Lawrence Radiation Laboratory]! Let's get it together. We've got a lot to get together today.

[*Following this invocation petitioner proceeded to point out that the student movement was failing to respond adequately to the continuing war and several cited instances of domestic oppression. After adjuring the audience to remedy this lack by renewed dedication, he went on as follows:*] Something was interesting this morning. There was a demonstration, there was a demonstration out at the Lawrence Radiation Laboratory in Livermore. And what that says, what that says is that people are starting to make new connections. And that's what we're here about today— starting to make new connections. We know there's a war in Vietnam going on, we know that there is repression against black people and especially against the Black Panther Party. And we also know—and we show that we know by going out to Lawrence Radiation Laboratory and by the actions that are planned here today—that we understand that the war in Vietnam is not simply a misplaced, one-shot evil that we have to fight against. We know that the war in Vietnam is part of a world-wide system of American imperialism that not only fights in Vietnam, not only has troops in 80 countries throughout the world, not only represses black people and keeps women in a subservient role in this society, but imperialism is a system that uses the University of California as one of its primary tools in the fight against the struggling people of the world. And we were out there at the Lawrence Radiation Laboratory this morning to demand that that laboratory be shut down and stop war research. We were recognizing clearly that this university, the University of California, is not an academic institution, it's not a place of higher learning, it's not a place of free inquiry, but rather it's a factory, a place where people are made, where machines are made, where research is done to tie into the American war machine, and that's what we're about when we're here today, an understanding of that.

[*Here petitioner went on to suggest that establishment resistance to the efforts of the student movement was beginning to manifest itself in new and subtle forms. He complained of inadequate advance press coverage of the "second Vietnam moratorium" which was taking place that day and which was the occasion of his speech. He also sought to draw sinister implications from the fact that a moon shot was scheduled for the day of the moratorium. Then he addressed himself to the major question of his address: the proper attitude and actions which the student movement must undertake in order to prevail in its campaign against the war. Using the devotion and solidarity of the North Vietnamese people as an example to be followed, he urged full and enthusiastic cooperation with them by the student movement, including the coordination of student activities in this country with military activities to be undertaken by the North Vietnamese in their "fall offensive." In discussing the general tenor of student activities which should be undertaken, he went on as follows:*]

And let me tell you something. The people who run this country, the people who run American corporations, the people in the Pentagon and the State Department in Washington, don't respond very well to moral arguments. When they're napalming thousands of people every day, when they're ready to commit genocide on black

people in the United States, I don't think that they are going to be moved very far if we fast for peace, or if we send letters to our Congressmen, or if we march, or if we talk, or if we sign a petition and so on. This I think is not going to influence the people who really hold power in this country. I think there is only one way to influence them and that is to make it impossible for them to continue this war, impossible for imperialism to function at home in the United States. We're fighting a system that makes war against innocent people fighting for their freedom in Southeast Asia; the kind of system that makes war on black people in this country; the kind of system that sends out bullies and toughs as police to beat up striking workers; the kind of a system that keeps half the population, women, down simply so that we can have a cheap labor force to exploit in the factories and in the homes; the kind of a system where Governor Reagan gets up and calls for a bloodbath; the kind of a system where Claude Kirk, the Governor of Florida, gets up and says we're going to fight, we're going to fight for racism; the kind of a system where the Berkeley Gazette, simply because they mistakenly think I'm going to run for the city council, are calling on the University to expel me.

That's what we're fighting and these are the people who tell us that we have to be nonviolent. The biggest murderers in the history of the world tell us that when we fight the system, when we fight against racism, when we fight against the war, when we fight against the oppression of women, when we fight against the destruction of the environment, when we fight against violence, we have to be nonviolent and get the [* * * *] kicked out of us if that's what they want to do. Well what I say is that that's not the way any more. We have to use whatever force is necessary in order to make sure that this war stops. The kind of force that we use cannot be compared to atom bombs, cannot be compared to the murdering of Fred Hampton in his sleep, or railroading Bobby Seale to the electric chair. But the kind of force that we have to use is people standing up and saying we are not going to allow ourselves, we are not going to allow our institutions to be tools of American imperialism any longer. Because as long as the University of California continues to train officers for the war in Vietnam, as long as it continues to produce atomic weapons, as long as counter-insurgency research goes on, as long as Charles Hitch from the Defense Department is our President, then we cannot say that we are free of waging imperialism against the people of Vietnam. We are guilty as long as those things go on.

[*Here petitioner represented to his audience that in spite of all obstacles the activities of the student movement had been successful in reducing R.O.T.C. enrollment in colleges and universities. He went on as follows:*] What we have to do then is build a mass movement on this campus that is capable of pushing R.O.T.C. off campus, capable of stopping Livermore, getting rid of President Hitch, ending research against the people of Thailand. And in order to do that, I think that we have to get ourselves together more than we've done so far. This demonstration today is a big crowd out, but it's not big enough.

[*At this point he went on to indicate certain organizational deficiencies which had lessened the effectiveness of the "second Vietnam moratorium" activities. The address closed with the following language:*] What I'm trying to run down is not so much to say that we've blown it, that we've screwed up, but just that we haven't really gotten together as seriously as we should get together. We're not going to end the University's complicity with imperialism by having a few people throw rocks or by having a few people engage in a madman demonstration because they can be picked off. The repression against the Panthers shows that when there's a small group, no matter how correct it is, no matter how much latent support it has from the people, that if it has not done all of its community organizing work, if it doesn't have the people squarely behind it every moment, that it can be cut down and eliminated. And that's why we have to build a mass movement on this campus,

because not only do we need it in order to survive, in order to succeed, but it's possible to build.

Now you understand that over 80% of the people on this campus voted two years ago for immediate withdrawal, and that the percentage is higher than that and there's no reason why we shouldn't have 15,000 people out for every demonstration against the war. And that's our job. It's our job then to get ourselves together on this campus, to get ourselves together so that everyone is involved, so that everyone understands how this University works, how the University helps the war machine. And that's what we have to start building on today. We have to start building today a movement, a movement that will be successful not only in the demonstrations today —because the demonstrations today have to be militant and successful at University Hall first, and then the R.O.T.C.—but we have to go on beyond that, no matter what happens today. We have to come back, we have to have meetings, we have to go out and talk to everyone on the campus, we have to get people involved so that we can really close this University down. If that's what it takes to make this University stop being a part of the war machine, then we have to close it down. Can you dig it? We have to close it down.

And at the same time we have to do much better than we've been doing in terms of protecting other parts of the movement. As I say, Bobby Seale is going to be arraigned next week in New Haven, Connecticut. This Sunday there's going to be a Free Bobby Seale Rally in the Greek Theater, with the speakers being William Kunstler and Jerry Rubin. I think it's important that everyone turn out for this Free Bobby rally Sunday in the Greek Theater with Bill Kunstler and Jerry Rubin. Not only come to the rally to yell that they want Bobby free, but after that rally to get involved in the organizations that are being set up so that Bobby Seale will be free, so that we can exert the kind of force and pressure and power necessary to see to it that Bobby Seale is free. We have to take the same attitude about the evictions in the Berkeley Tenants' Union. We're fighting a battle in this city. It's a battle that's related to imperialism. It's a battle that's related to the banks, and the companies, the landlords, the real estate holders, who run this country, who keep rents high in Berkeley. We have to all get out whether we're on strike or not to protest evictions so that we can take control of our own city.

O.K., I think that's enough rapping for now. What we're going to do now is move out of this place and get into making a start on the demonstrations to get rid of the war machine on this campus. We're going to get rid of the war machine on this campus starting right now. We're going to build a movement starting right now. There's a banner toward Sather Gate. That banner is going to lead people on a march around this campus. First down to University Hall, everyone should go down to University Hall for a rally there, a rally there to protest counter-insurgency in Thailand. And then to move on R.O.T.C. We've got to get this struggle going. We've got to get rid of R.O.T.C. Smash university complicity! All power to the people! Let's hear it. All power to the people! Smash R.O.T.C.!

APPENDIX B[3]

(1) *Testimony relative to the speech of May 15, 1969.*

(a) *Testimony before the Committee.*

[3]The following excerpts of petitioner's testimony before the subcommittee and the Committee were taken from the transcripts submitted to this court. Technical changes in punctuation and phrasing have been made, and the names of the various persons asking questions of petitioner have been omitted.

Q. And can you tell me again what you meant, then, when you said "Take the People's Park"? A. Well, again it's necessary to give a little background to the occasion so that I can try to convince you that my words were not understood by the people to whom they were addressed as a call for charging the policemen and attempting to rip down the fence.

Q. Well, you see, I am not asking necessarily for what the people who heard you understood you to mean. I am asking you what you meant when you said "Take the People's Park." . . . A. I meant to be endorsing a whole series of political actions in days and weeks to follow which would result in the fence being taken down, the people being given back the park. Now, to explain more fully, perhaps more convincingly, I would have to go into the context of the speech and what the scenario for that day was to be as I understood it.

Q. You see no causal connection, as I understand it, between your speech that day and anything that happened after your speech. Is that correct? A. That's correct. I think you and I may have a very different understanding of what in fact happened after my speech.

. . . . . . . . . . . . . . . .

Q. . . . [C]ould you explain to me what you meant by the portion relating to making it more expensive for them to put the fence up? And also what you meant by "Be careful. Don't let those pigs beat the [* * * *] out of you, don't let yourselves get arrested on felonies"? A. O.K. O.K. Well, would it be all right if I start at the beginning of that paragraph?

Q. Fine. A. Now, when I said "we have not yet decided exactly what we are going to do," I was referring to all of the people there as being the "we." We were a big group of people and we had not yet decided on any course of action.

Q. Excuse me, Mr. Siegel. May I interrupt right there? The tape shows that someone at that point said: "That's not true." A. Right. I was about to get to that, sir.

I wanted to make it clear that also there is nothing like existing on the Berkeley campus (and I think that this is unfortunate) a big organization which provides leadership to students in such a situation, and there was in my mind no legitimate, small group of people who could have met and could have decided what we, the two or three thousand people there, were going to do. And that is what I meant in the first sentence.

Someone said: "That's not true, Dan." Indicating to me or perhaps reminding me that there were a lot of individuals and perhaps small groups around that had . different proposals. And I could very easily guess what some of them were; in fact, had some inkling about what some of them were. In fact, the proposals that I expected to be brought up after I finished speaking were: (1) a march to the Chancellor's office, which had been planned several days before, before anyone knew the fence was going to be put up that morning. I figured that that would be one proposal that would come up.

I thought also there would be a variety of proposals advocated, including charging the fence and perhaps ripping it down; perhaps some type of civil disobedience right there or perhaps around the Park, or something of that nature. And so when this person reminded me "That's not true, Dan," I said: "There are some plans."

And then when I said: "let's go down to the People's Park, because we are the people," then I said that I wanted to make "a couple of points."

And when I said: "We have to make it more costly for the University to put up the fence, than it is for them to take it down," I meant, as I tried to express in answering other questions, that we had to mount a campaign that would make it very costly for the University to leave the fence up and in fact make it advantageous for the University to take it down, as I said. And I had in thinking about the general philosophy that I have expressed to the Committee earlier today: that we would attempt to move public opinion; that we would go out into the Berkeley community; we would attempt to influence people that would work on the campus community; that we would take actions in regard to the Berkeley City Council, in regard to the Regents of the University of California——all designed to create a climate where the University would feel that it was in its best interests to take the fence down. And that is because I thought that the University was in the wrong, that the people who had built the park were in the right, and that we could convince everybody that that is what should happen. And that is what I meant by maximizing the cost to the University.

Then knowing that some people would probably advocate some kind of suicide, kamikaze course in regard to the fence, I said: "People be careful." I said: "Don't let the police beat the [* * * *] out of you, don't let yourselves get arrested on felonies." That's a way of saying: "Don't do things which would give anyone the excuse to do those things to you. Don't charge the fence, because you will probably get a club laid along the head. Don't charge the policemen, because you can be arrested for an assault on a policeman."

But not knowing that there would be any civil disobedience later, but thinking that there might be, I didn't want to express a positive opinion towards advocating such conduct. Because at that time I didn't know that there would be civil disobedience later, but I made it clear by what I was cautioning people to do that they shouldn't "trash," they shouldn't riot. But I wasn't necessarily saying, though, that they shouldn't do something that would bring about arrests on a misdemeanor. If somebody had suggested that two or three thousand people have a sit-in right there, I wouldn't have argued against it. That is why I urged people not to do things for which they would be arrested on a misdemeanor.

And then the statement "go down there and take the park" was a kind of a wrapup statement of, you know, meaning to say to people "Let's be strong. Let's have unity. Let's act in a straightforward and serious way so that we get the Park back." And then I stopped. And then I expected these various plans to be put forward and I expected a decision to be made. Instead, what happened: the rally ended and people walked down the street and matters ensued from there. But that was entirely my intent and my knowledge at the time that I made the speech.

(2) *Testimony relative to the speech of March 6, 1970.*

(a) *Testimony before the subcommittee.*

Q. Will you tell the committee what you were advocating when you said, "But just at the same time I am not going to tell you that nonviolence is the way, and we should avoid violence because it is bad, or something like that, I am going to tell you this, that we have to be, as time goes on, as the [* * * *] comes down heavier and heavier in Babylon we have to be a lot heavier about the kind of violence that we're going to perpetrate." Would you tell the committee what you were advocating by these statements? A. I was trying to get across to people that if they are thinking about perpetrating violence, they have to be a lot heavier about it—heavier, meaning they have to give it much more serious consideration than they had been giving it up to that time. There are some people around who think any time you break a window, that is a great revolutionary act, and if you don't break a window, or in

any way speak out against it, then you are a coward or not really committed, or something like that. And there had been a demonstration in Berkeley, I believe, in February of 1970, which had consisted of exactly that kind of activity. People had gone around and broken some car windows and windows in little shops, and so forth, and this, in my opinion, is a stupid and indefensible activity. I was trying to get people to reconsider their actions and their plans, in light of what I thought were more serious considerations than this approach people take: Rah! Rah! for violence! I think this hangs together, and I think it leads into the actions that I proposed in this speech.

· · · · · · · · · · · · · · ·

Q. You went on to say, "We are going to have to talk about violence. The question is not violence versus nonviolence. The question is when violence, and how violence, and what violence." Were you, by those words advocating violence under certain circumstances? . . . A. Well, just to try to go over the whole thought, as it is expressed here, first of all, we are in a situation where there is a lot of talk, back and forth, which I do not consider sincere talk or properly effective talk, or really very intelligent talk, about violence versus nonviolence. Some people might get up and say violence is great, and anything that is violent is great. Other people might get up and say nonviolence is the only way, violence is a sin. I felt this discussion was not only very sophomoric, but also was not resolving the issue very well, was not helping people to get together. What I was trying to say was that this is a foolish type of debate, because the question is not violence versus nonviolence, but if you are thinking about violence, you have to think about the when, the how and the what, and you have to really think about these four things: what are you going to accomplish; how to accomplish it; who we have to get on our side; and how we get people on our side. I said you should think about violence in these terms, and the conclusion I drew from thinking about violence in these terms is that we should get community groups together, working in the community on different issues, make a coalition and try to get seats on the Berkeley city council. That is where the argument led me, and that is what I was advocating in this particular speech, and what I advocated for over a year following the speech and participated in right up to the municipal elections on April 6th 1971. It is part of that. . . .

(b) *Testimony before the Committee.*

Q. In this speech, as I understand it, you are advocating violence. Is that correct? A. No.

Q. Well, it says here: "The question is when violence, and how violence, and what violence." What did you mean by that if you were not advocating violence? A. The situation in which this speech occurred was a situation in which some time within the week previous to this night there had been what is known in Berkeley as a "trashing." And what that means is that a group of people with which I had absolutely nothing to do had gone through business districts of Berkeley and had broken out the windows in a lot of stores. And as a result of that there was a great deal of tension in the community and there was great fear of violence by people who had committed "trashing" acts, and also by the police. And there was to be a rally for the purpose of determining what type of political actions people in the community would engage in from that moment into the future. And it was very difficult, first of all, to secure a permit for the rally. The police were afraid that it would erupt into violence and were reluctant to allow us to use Provo Park, where the speech was made. And I had been the person who had negotiated the permit from the Berkeley Police Department and I was one of the speakers. And I attempted to make a speech that would in the context of that situation convince people to engage in the action that I was going to suggest. And so in order to do that I felt that it was

necessary to provoke people who thought that "trashing" was really the greatest thing to do in order to create political change into listening to my arguments. And so what I attempted to do in this speech was not just stand up and say "Violence is a bad thing," you know, and "You shouldn't do violence because it is bad," and "Instead, we should run candidates for the Berkeley City Council." Because I thought that if I had taken that approach, I would be entirely unconvincing to some parts of my audience that I wanted to be convincing to.

. . . . . . . . . . . . . . . .

Q. Let me ask you this in regard to that answer: You state, "And, brothers and sisters, I am not going to get up here and tell you that in this society nonviolence is the way, because that's [* * * *], we all know that." Now, do you feel "that in this society nonviolence is . . . [* * * *]"? A. Yes. And again with an explanation. When I said in that speech that "nonviolence was [* * * *]," I was referring to a philosophy. I was not referring to nonviolent conduct. And there is a philosophy of nonviolence which, as I understand it, says that all people have to do is to act nonviolently in the face of nonviolence [sic] and then at some point in the future the perpetrators of the violence will become nonviolent themselves on the basis of our fine example. I think that that is an erroneous philosophy. But my saying that that philosophy is erroneous does not, does not say that the converse is true, that violence is proper. It just says the particular philosophy, just like the particular philosophy of fascism, is not a good philosophy. It doesn't make sense, doesn't create the type of society we would like to see created. It doesn't work.

Q. So, then, your belief then and your belief now are "that in this society non-violence is . . . [* * * *]"? A. Again I think that the question asked that way really presents a double entendre. If I just say to you "Yes," then it is very easy to assume from my answer that what I am saying is that violence is great. And I think that I have explained that I think the particular philosophy—which is a real, spelled out philosophy in the world of philosophy—of nonviolence is not an accurate or successful or real philosophy. But I don't mean to say that therefore violence is great. I don't mean to say that.

(3) *Testimony relative to the speech of April 15, 1970.*

(a) *Testimony before the subcommittee.*

Q. How is the audience to know when you are speaking in terms of political rhetoric and when you mean literally what you say? . . . A. To give an example, I don't know how to just sort of make general definitions that would answer the question, but if a speaker were to say something like, "Smash R.O.T.C.," and he was speaking to a group of antiwar activists, I think that that particular phrase, because of its association to that group, would mean something to the effect of "no more R.O.T.C.; let's mount the campaign against R.O.T.C." I don't think there would be any misunderstanding in that context, that people were talking about, like, smashing R.O.T.C., such as smashing a beetle, or something.

Q. Well, using that example, assuming you said in a speech at Sproul Plaza, "Smash R.O.T.C.," and in the same speech you advised the crowd there was a banner beside the plaza and it would lead them across the campus, and the banner did lead them across the campus, and finally to the R.O.T.C. building, which was then pelted with rocks and missiles. Would you say that the audience had misunderstood your meaning? A. Well, I think you are referring to a specific speech I made on April 15th 1970.

Q. I am referring to a specific speech in this question. A. And in that speech I think it is clear, without counting upon the audience to guess what I mean, that I

did not mean the people should throw rocks at the R.O.T.C. building. I believe I said that throwing a few rocks would not be an intelligent thing to do, or a productive thing to do.

Q. If the audience, after your speech, followed the banner, as you had suggested, and ended up throwing rocks at R.O.T.C., do you state that they had misinterpreted your words? A. If the reason they were throwing rocks at the R.O.T.C. building was because of something I had said, rather than for some other reason, and if they used my speech as a justification of their action, I would say they misunderstood my speech.

(b) *Testimony before the Committee.*

Q. Well, what did you mean when you said "Smash the R.O.T.C.," "Smash the University"? A. Again, as I said in that speech and as I said on prior occasions before the subcommittee, it is the question of advocating a course of conduct, strategy of actions, which would result in the objective sought. I don't know how to make it as clear to you as I would really like to, but—

Q. I am just asking you to define the word "smash" in that context—A. Well,—

Q. —and in the context in which you used it. A. Well, to act in a way which would get rid of R.O.T.C. And I didn't think that—As I said in that speech, I think it is really inane for people to think that by throwing rocks at a building or a few policemen, or sticks or even burning down the building, that would smash R.O.T.C. That is not the way R.O.T.C. will be smashed. R.O.T.C. will be smashed when people feel that R.O.T.C. is an evil institution and don't want any part of it. And I believe that—I think my record speaks for itself in a lot of ways. Because the type of advocacy that I have engaged in has made a contribution to the fact that R.O.T.C. enrollment at universities, at Berkeley and throughout the country, is down like one-third, down to one-third, of what it was in former years. And it is not because buildings have been burned, but because people have rejected the idea of being trained by R.O.T.C.

(4) *Testimony indicating petitioner's general views concerning "radical" political action and the role of violence.*

(a) *Testimony before the subcommittee.*

Q. Do you think the transformation of this society is going to occur by what happens in the streets? A. In the streets, and other places. . . .

Q. Would you tell the committee what you meant by those words? A. Well, what I meant to say is that the social changes that I believe are necessary in this society will be won by political means other than through the filing of test litigation and test cases in courts; and specific political means include many activities, including massive mobilizations and demonstrations of people, marches, strikes, rallies, picket lines—

Q. Would it include demagogues haranguing crowds? A. I can't answer that question. I don't know what you mean by that. I would like to conclude, though, my last answer by saying I also mean to refer to traditional political action, through campaigns and organizations of people, to take public office through the electoral process.

Q. Winning the battle in the streets—by that you mean registering people to vote and urging them to vote in the elections? A. That's right. That is part of what I mean.

(b) *Testimony before the Committee.*

Q. Why is it [burning a bank] not the right thing to do? What is your reason? A. It is very hard for me to answer a question like that without placing it in a context of my beliefs. I mean, I don't happen to hold a set of beliefs where a very easy answer might be that "God says that it is wrong to destroy other people's property; therefore it is wrong." That is not the kind of answer that I can give you. My answer is a much more detailed one. It has to do with a conception of society, how it operates, what its purposes are, and how to change it. And it is from my conceptions of this nature that my ethical and moral beliefs arise. They are not something distinct or separate from the total philosophy of life, the history of society. And within that context the burning down of the banks of the Bank of America doesn't have very much to do with making the world a better place to live in and henceforth it is not correct. And of course there are other answers which are subsidiary to that in my mind. Perhaps they·are more what you have in mind. But I think it would be wrong to burn down a bank because I might kill people. Killing people is a very bad thing to do according to the way I feel about it. I was very unhappy when a graduate student was killed in an explosion at the University of Wisconsin a couple of years ago. I think that killing people is wrong. It is wrong to destroy other people's property. I consider that to be a less-important wrong than a wrong of killing people, but I believe the people have a right to own their property and to own it free from its being destroyed. But the most important reason is that it is just within the context of creating a better United States, creating a better world, the burning of the banks of the Bank of America isn't that relevant. And that to me is the most important reason.

Q. Do I understand correctly, Mr. Siegel, either one of these readings of your answers? In the first place, it is wrong in the sense that it is inexpedient, that is, that it doesn't accomplish the purpose that is in your mind? Or, in the second place is it wrong because it really isn't "relevant" (your word) or having much to do with the particular political end that you wish to accomplish? A. I think it is wrong for both of those reasons—and more, as I have attempted to explain.

Q. And more? A. And more.

Q. Have you given us all the "more" that is in your mind? A. Well, let me give you an example which might make clear what I am trying to talk about. Let's take the country Greece. Now, in Greece they have a very oppressive and, I consider it, fascistic government which deserves to be overthrown by the people so that they can institute a democratic government and create a better life for the people of Greece. Now, there is a couple of ways in which this might be done expediently:

1. A group of ten colonels in the Greek military might get together and decide that they are really a bunch of good fellows and they have good intentions, and they are going to divide up wealth and give people equality in the administration of justice, political rights and so forth; and they could sneak into one of the other colonel's cocktail parties, shoot them and install themselves as a new dictatorship and be benevolent, give the people bread and things like that. That would be expedient, but it would be wrong—and not just wrong because they kill people.

2. Another model would be: Suppose a group of people in Greek society have organized millions, the majority of the Greek people who favor the overthrow of the fascist government there, and they might engage in tactics such as general strikes, work stoppages, formation of a shadow·government in the cities and countryside, educate people as to the benefits of democracy and thereby take power. Perhaps incidentally executing the current government, but I don't think that that is really a necessary aspect of it.

Now, the second method is right and the first method is wrong. And I consider it to be a moral question aside from the question of expediency. They are both ex-

pedient. Both result in full bellies for all the people of Greece. But only through the second method, which has changed the minds and hearts of the Greek people to the extent that the people of Greece themselves have been bettered through changing their experiences in life, will you be able to create in fact a just, intelligent, and humane society. In either case it may be said to be expedient, but only through the second method would there be an opportunity for success of a long-range improvement of life.

Going back to the Bank of America. Burning the property of the Bank of America is likened to the model in which the colonels were assassinated. It doesn't accomplish very much in the long run. It doesn't show trust in the people. It doesn't show concern for majority democracy. It doesn't show concern for the benefit of mankind especially, except in sort of a leaderless way. And in that it is wrong, it is oppressive, and it is immoral. So when I talk about the morality of political action and I say doing some kind of mass organizing is right and carrying out a putsch is wrong, I mean more than questions of expediency. I mean questions of morality and the whole, general philosophy of life.

Q. I don't mean to be repetitious in what has gone before, but I would like you to answer, if you can: Under what circumstances would it be correct to burn down the Bank of America and its branches? A. As I have said before, I can't imagine the circumstances.

. . . . . . . . . . . . . . . . .

A. I think that everything I have said establishes pretty clearly my position, the type of person that I am. And I would say that the course of conduct in which I have engaged has been a consistent one from the time that I decided to become an attorney. Which was actually in high school when I first started to think about it. And I always thought that the reason that I would become an attorney would be to combat injustices that I believe to exist in society; to defend unpopular people; to work within the legal system to eliminate some injustices which may occur. And I have been a person for many years who has followed this course of conduct both within and without my legal activity. And I think that I have been aggressive in doing so and I think that I have been consistent in doing so, and I think that I have acted in good faith in doing so. I feel very strongly that my activities have been within the tradition of the aggressive bar that was described. And if I were to be admitted to the bar, I would continue in such activities. I feel strongly that what I have done has been protected by my constitutional rights in almost every occasion. I admit that I have made some mistakes and I am sure that I will continue to make some mistakes. But I do feel that my course of conduct has been a conscientious one and it has been consistent and is not indicative of a bad moral character.