644 P.2d 249

**In the Matter of a Member of the State Bar of Arizona, Richard G. KLEINDIENST, Respondent.**

No. SB 60–2.
State Bar No. 79–1–S19.

Supreme Court of Arizona,
In Banc.

April 23, 1982.

---

David E. Brauer, John F. Foreman, Phoenix, for petitioner.

Lesher, Kimble & Rucker by Robert O. Lesher, Tucson, Ryley, Carlock & Ralston by George Read Carlock, Phoenix, for respondent.

GORDON, Vice Chief Justice.

This disciplinary action is before us under Ariz.R.S.Ct. 37. The Disciplinary Board of the State Bar of Arizona, finding true four of the original nine charges of unethical conduct, recommended that Richard G. Kleindienst, respondent, be suspended from the practice of law for one year. Kleindienst timely filed an objection pursuant to Ariz.R.S.Ct. 36(d). We find two of the charges supported by clear and convincing evidence and therefore order that Kleindienst be suspended from the practice of law for one year.

## FACTS

Kleindienst's alleged misconduct involves a complicated set of circumstances. The relevant transactions revolve around Joseph Hauser and his associates [the Hauser group].

Hauser manipulated and looted legitimate and fraudulent insurance companies and freely assigned insurance contracts and funds from one company to another as fit his purposes. The Hauser group completely owned Family Provider Life Insurance Company, an Arizona corporation, and Great Pacific Corporation, Family Provider's parent. Hauser's group managed to obtain an agreement with Old Security Life Insurance Company whereby Old Security would "front" insurance for Family Provid-

er and assign 80% of that insurance to Family Provider.[1]

In 1976, the International Brotherhood of Teamsters accepted bids for a group life insurance policy for its Central States, Southeast and Southwest Areas Health and Welfare Fund. The Hauser group discovered, through inside information gained from a member of the Teamsters' consulting company, how to acquire this substantial contract. Without Old Security's authorization, the Hauser group submitted a bid in Old Security's name and falsified a report on Old Security's assets to make the company appear more expansive than it really was.

The Hauser group obtained more inside information and found out that although Old Security had submitted the lowest bid, the Teamsters were leaning towards awarding the contract to Prudential Insurance Company. The group then contacted Thomas Webb, an acquaintance of both Teamster President Frank Fitzsimmons and Kleindienst. Webb knew that Kleindienst and Fitzsimmons were good friends. In fact, Kleindienst had done some legal work for the Teamsters' pension fund. Believing that Kleindienst would be the best person to influence Fitzsimmons, Webb telephoned Kleindienst and offered him half of the $250,000 fee Webb would receive if Old Security obtained the contract.

Kleindienst agreed to help Webb and Old Security. After calling Fitzsimmons several times and confirming that Old Security was the lowest qualified bidder, Kleindienst asked Fitzsimmons to do whatever was possible to assure Old Security would get the bid. The Teamsters did award the contract (which involved a $23 million premium) to Old Security in April, 1976.

Shortly after the contract was awarded, Hauser, accompanied by two members of the Hauser group named John Boden and Brian Kavanagh, went to Kleindienst's offices at his then law firm in Washington, D.C. There, Hauser had Boden give Kleindienst a check for $250,000 to split with Webb. At this time, it was revealed to Kleindienst that he had been working for Great Pacific rather than Old Security. After explaining Great Pacific's interest in Family Provider and Family Provider's reinsurance agreement with Old Security, Hauser asked Kleindienst to be general counsel for Great Pacific. Kleindienst accepted.[2]

At about this time, the Hauser group, through Great Pacific, was negotiating with American Financial Corporation to buy American Financial's wholly owned subsidiary, Great American Life Insurance Company [GALICO]. Because GALICO was a New Jersey insurance corporation, the New Jersey Department of Insurance had to approve the sale. The Hauser group concocted a scheme to bolster Great Pacific's balance sheet so that the New Jersey authorities would give their approval to the GALICO transaction. On May 1, 1976, Family Provider declared a $1.8 million dividend in favor of Great Pacific, its parent. Family Provider normally had only minimal capitalization, and it paid the dividend mostly out of the initial premiums received on May 10 by Old Security from the Teamsters. Without Old Security's knowledge, Kavanagh had $1.5 million of the initial $1.7 million premium transferred to Family Provider's account.

The Arizona Department of Insurance received information about the Family Provider dividend paid to Great Pacific. Because Family Provider at the end of 1975 had only minimal capitalization and no record of ever writing any insurance business, the Arizona Department of Insurance's curiosity was aroused. The department investigated the declaration of the dividend. J. N. Trimble, Director of the department, met with Boden and his lawyers on May 18, 1976 and ordered the dividend money returned to Family Provider within 48 hours.

1. Apparently, Old Security retained all the risk but gave Family Provider 80% of the premiums collected.

2. Kleindienst thereafter executed an agreement with Webb whereby Kleindienst would pay to Webb 15% of all fees received by Kleindienst's law firm from Hauser in those cases where Webb assisted Kleindienst.

On May 19, a series of eventful meetings took place in Kleindienst's suite of offices in Washington, D.C. Present were Kleindienst, Hauser, Boden, Kavanagh, and Donald Klekamp and James Evans, attorneys for American Financial. The original purpose of the meetings was to work on the proposed GALICO sale. But Boden had just returned from Arizona with the order to return the dividend, so he, Hauser, Kavanagh, and Kleindienst also discussed how to comply with Director Trimble's order within the 48 hour time limit. Although Hauser initially was opposed to returning the money to Family Provider, the others convinced him to comply with the order.

American Financial was holding $1.1 million of the dividend as earnest money for part of the GALICO sale. The Hauser group prevailed upon Klekamp and Evans to assign that part of the sale to Family Provider and deposit the $1.1 million in an account in Family Provider's name in the Provident Bank of Cincinnati, Ohio, a subsidiary at the time of American Financial. The group also deposited $700,000 in a Family Provider account in the Diplomat Bank of Washington, D.C.

On May 20, 1976, Kleindienst sent a telegram to Trimble advising him of the return of the funds. Kleindienst also arranged for officers of each bank to send telegrams to Trimble advising that the funds were on deposit in Family Provider's name and were unencumbered. When the banks sent the telegrams, however, only the Diplomat Bank telegram affirmatively stated that the funds on deposit there were unencumbered; the Provident Bank telegram was silent on the matter of encumbrance. Trimble did not receive any of this information in writing until after the 48 hour deadline had passed, so he ordered a formal hearing on the matter.

The Arizona Department of Insurance hearing took place in Phoenix, Arizona on May 24, 1976. Boden testified at the hearing on behalf of Family Provider. Kleindienst attended as counsel for Great Pacific; Paul Madden of the Phoenix law firm of Lewis & Roca represented Family Provider.[3] Boden testified that the funds had been returned unencumbered and no new dividend would be declared without the department's approval. As a result of the hearing, no action was taken against Family Provider at that time.

Although Kleindienst contests the issue, the funds in the Provident Bank apparently were still encumbered by American Financial. Late in the day on May 19, Kavanagh signed two letters that a secretary in Kleindienst's firm had typed. American Financial had assigned part of the sale to Family Provider and had allowed the $1.1 million put up by Great Pacific to be deposited in Family Provider's name, but as the letters acknowledged, American Financial still had a right to those funds as a down payment for the pending sale.

Subsequently, the New Jersey authorities refused to approve the GALICO sale. When that sale fell through, Hauser set Kleindienst to work on finding another insurance company to buy, which he did eventually find. During the sale of that company, the proverbial roof finally fell in on Hauser's group. Members of Hauser's group and Kleindienst became the subject of a United States Senate investigation and were also named as defendants in a multitude of civil suits.

A person aware of Kleindienst's involvement in the investigation and the suits requested the State Bar of Arizona to look into Kleindienst's conduct. During the

3. Lewis & Roca had incorporated Family Provider and had been its counsel since that time. The firm began to question the bona fides of Family Provider during the events surrounding the declaration and return of the dividend. Boden had been told of the firm's intent to withdraw as counsel for Family Provider by the time he went to the May 19 meeting with Kleindienst and Hauser's group. On May 20 and 21,

Kleindienst called Madden and Robert Moya, another of the firm's attorneys who handled Family Provider's business, and convinced them to remain as Family Provider's counsel at least through the hearing because there was insufficient time to retain new counsel. Shortly after the hearing, Lewis & Roca did withdraw as Family Provider's counsel.

bar's investigation, Kleindienst gave a deposition detailing his participation in the Hauser group scheme. The gist of Kleindienst's statement was that he, as well as many others, had been duped by Hauser's group and that he did not knowingly engage in any illegal or unethical conduct. The four charges presented to this Court by the State Bar allege that Kleindienst perjured himself in that and other depositions.

### COUNTS II and VI [4]

 Counts II and VI allege that since the time it was incurred, Kleindienst either knew or had suspicions about the encumbrance retained by American Financial on the Family Provider funds in the Provident Bank. Count II additionally alleges that Kleindienst failed to correct Boden's testimony before Trimble on May 24, 1976 that the funds were unencumbered and lied about his knowledge or suspicions of an encumbrance when he was deposed by the State Bar on April 14, 1978. These charges are not supported by the evidence, so we must dismiss them.

This Court is the ultimate trier of law and fact in an attorney disciplinary proceeding. *In re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974). Before an attorney may be disciplined, the evidence of that attorney's ethical misconduct must be clear and convincing. *Id.*

The Disciplinary Board of the State Bar, by a vote of 5–4, found true the allegations in Counts II and VI. State Bar counsel alleged that Kleindienst knew of the encumbrance through: (1) knowledge of the encumbrance letters signed by Brian Kavanagh on May 19, 1976; (2) a conversation with James Evans on May 20, 1976; and (3) a conversation with Paul Madden just before the hearing with the Arizona insurance authorities on May 24, 1976. The evidence does not clearly and convincingly establish such knowledge.

Brian Kavanagh signed two letters on May 19, 1976 that acknowledged American Financial's retention of an encumbrance against the Family Provider funds in the

Provident Bank. No one testified that he or she ever showed the letters to Kleindienst or discovered that Kleindienst had personal knowledge of them. Janice Swales, a secretary in the law firm to which Kleindienst belonged at the time of these transactions, testified that she typed the letters for Kavanagh. She stated that Kleindienst left the office on May 19 before she typed the letters, and, per the firm's policy, she made no copies of the letters because they were typed for an outsider.

The conversation with Evans allegedly ties in to the Kavanagh letters. Evans had personal knowledge of the Kavanagh letters when they were drafted and signed. W. Donald Gray, an investigator for the United States Senate, talked to Evans in November of 1976. Gray stated that Evans told him that Evans and Kleindienst had discussed the Provident Bank funds on May 20, 1976. The language of the telegram that Provident Bank would send to Trimble was also discussed. During the conversation, Evans allegedly told Kleindienst that the telegram could not state that the funds were unencumbered because both he and Kleindienst knew that they were not. Evans also gave the Arizona Attorney General's Office a written statement on April 17, 1978. In that statement, Evans indicated that he had told Kleindienst the telegram could not say that the funds were unencumbered. But Evans' statement is ambiguous as to whether he told Kleindienst the reason the language could not be included was because the funds were encumbered. At the time he was deposed for the State Bar hearings in this matter, however, Evans professed no present recollection of the content of his conversation with Gray or of his statement to the Arizona Attorney General.

On May 21, 1976, Kleindienst, representing Great Pacific, and Paul Madden, representing Family Provider, had phone conversations concerning the hearing with the Arizona insurance authorities scheduled for May 24, 1976. Madden testified that he pointed out to Kleindienst that the Diplomat Bank telegram stated that the Family

---

4. The individual counts are identified as they were in the original nine-count complaint.

Provider funds on deposit there were unencumbered but that the Provident Bank telegram was silent on the question of encumbrance. Although he expressed concern to Kleindienst over this difference and the probability that it would disturb the Arizona insurance authorities, Madden never stated that Kleindienst told him anything about whether the funds were encumbered.

Kleindienst denies knowledge of the encumbrance before November of 1977. Further, a jury that considered criminal charges against Kleindienst arising from the same perjury allegations acquitted him. The only direct evidence against Kleindienst—Gray's testimony about his conversation with Evans and Evans' statement to the Attorney General—is inadmissible hearsay. After a thorough review of the record, we conclude that the evidence of Kleindienst's alleged misconduct in Counts II and VI is not clear and convincing.

## COUNTS IV and V

Counts IV and V, which were sent to us by a 6–3 vote of the Disciplinary Board, concern the location of the deposit of the Family Provider funds when Great Pacific returned the $1.8 million dividend to Family Provider. Kleindienst gave a deposition on October 28, 1977 in the civil case of *Old Security Life Insurance Company v. National American Life Insurance Company* and gave another deposition on April 14, 1978 in the course of these disciplinary proceedings. The State Bar charged that Kleindienst either knew or believed his testimony in both these depositions was untrue when he unequivocally stated that he never had a conversation with anyone about whether the dividend funds should be deposited in an Arizona bank rather than in out-of-state banks. This misconduct is alleged to be in violation of DR 1–102, Ariz.R. S.Ct. 29(a), which provides:

"A lawyer shall not:

"1. Violate a Disciplinary Rule.

"2. Circumvent a Disciplinary Rule through actions of another.

"3. Engage in illegal conduct involving moral turpitude.

"4. Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"5. Engage in conduct that is prejudicial to the administration of justice.

"6. Engage in any other conduct that adversely reflects on his fitness to practice law."

We find that the evidence against Kleindienst on these counts is clear and convincing, as required by *In re Moore*, 110 Ariz. 312, 518 P.2d 562 (1974). Trimble, Director of the Arizona Department of Insurance, never told Boden or anyone associated with Family Provider that the dividend paid to Great Pacific had to be returned to an Arizona bank. But Donald O'Dean, the department's chief examiner, told Robert Moya, a law partner of Paul Madden and another attorney for Family Provider, that the funds would have to be deposited in an Arizona bank to comply with the department's ordered refund. Moya testified that he talked over the telephone with Kleindienst on May 20, 1976. Moya informed Kleindienst that the Arizona insurance authorities were demanding that Family Provider not only regain the $1.8 million dividend within 48 hours but that Family Provider deposit the funds in an Arizona bank. According to Moya, Kleindienst adamantly refused to comply with this requirement (and used a well-known four-letter expletive in doing so).[5]

---

5. Moya's testimony against Kleindienst in December of 1979 is consistent with the letter he sent to Boden, his client, on May 21, 1976 after Trimble had scheduled a formal hearing on the Family Provider dividend matter. One paragraph of that letter reads:

"It is unfortunate that the hearing was ever scheduled. The director and the Chief Examiner made it clear to me what had to be done by Family Provider to avoid the hearing. I communicated their requirements to Richard Kleindienst, Family Provider's lawyer in Washington, D.C., who indicated to me that he was responsible for handling the dividend matter on behalf of Family Provider. Mr. Kleindienst determined to proceed in a manner other than that requested by the Director of Insurance and the Notice of Hearing followed as a direct result of Mr. Kleindienst's actions."

Moya's testimony is corroborated by Madden's testimony. Madden talked to Kleindienst by telephone on May 21, 1976 and discussed the steps taken to comply with Trimble's order. Madden said that Kleindienst told him that the funds would not be returned to Arizona because Trimble might tie them up.

Kleindienst had also discussed the matter with members of the Hauser group. Boden, in testimony before the United States Senate and in a deposition, indicated that whether the funds should be returned to Arizona was a topic of discussion during the meetings between the members of the Hauser group and Kleindienst concerning the dividend problem. According to Boden, Kleindienst opined that the dividend must be returned to Family Provider to avoid trouble with the Arizona insurance authorities but that it should not be deposited in an Arizona bank because Trimble might freeze the funds.[6]

In the relevant depositions, Kleindienst denied any participation in these conversations. At the hearing before the State Bar, Kleindienst at first repeated his absolute denial of such conversations. Then, he equivocated and indicated that he would not remember if such conversations took place because they would have been immaterial given that Trimble never required deposit of the funds in Arizona.

Kleindienst does admit that he can think of no reason why Moya, Madden, or Boden would lie to discredit him. The record also discloses to us no reason why these men would not have told the complete truth about Kleindienst. Kleindienst, however, has a motive to conceal the truth. He had earned $125,000 for his law firm for approximately five hours of work on the Teamsters' insurance contract. His continued relationship with Hauser promised to be lucrative. By Kleindienst's own testimony, the reason he went to the hearing in Arizona was to impress his new clients on his home ground. Kleindienst's claim at the State Bar hearing that the conversations would have been about an immaterial subject is not consistent with the evidence. At the time Kleindienst was first questioned about his participation in the Department of Insurance hearing and return of the dividend, he did not know that Moya was mistaken and Trimble had not ordered the money to be returned to Arizona. All Kleindienst knew when first questioned was what Moya had told him; because Moya said the department had ordered the funds returned to Arizona, the conversations in question were at that time material. Thus, to protect his financial interest, Kleindienst had a motive to keep Trimble from interfering with his client's funds, and when the matter first came to light, he did not know that he or his client would suffer no consequences as a result of his advice to keep the funds out of Arizona and away from Trimble. Kleindienst had reason to conceal the truth initially and was then trapped by that story when he later learned that Trimble had not required a return of the dividend to Arizona banks.

■ The best support Kleindienst can muster for his defense is that the jury that considered the criminal charges arising from the same alleged perjury acquitted him. Although serious consideration should be given to a jury's verdict of acquittal of an attorney for the same conduct that is the subject of bar disciplinary proceedings, *see Siegel v. Committee of Bar Examiners*, 10 Cal.3d 156, 110 Cal.Rptr. 15, 514 P.2d 967 (1973), the acquittal is not conclusive of any fact in the bar proceedings, especially when there is substantial evidence contrary to the

---

6. Kavanagh, who also attended the meetings, related a somewhat different version. He testified that he wanted to return the money to Arizona, Boden did not want to do so, and Kleindienst indicated that he could handle it either way because of his relationships and influence in Arizona. Kavanagh also impeached Boden's credibility. But even if Kavanagh is believed and Boden is discredited, the fact remains that Kleindienst did discuss returning the money to Arizona at the meeting

verdict.[7] Proof of guilt in a criminal trial must be beyond a reasonable doubt, but proof of misconduct in a disciplinary proceeding need only be clear and convincing. Thus, although the evidence against Kleindienst may not have convinced a jury that he was guilty beyond a reasonable doubt of committing one or more crimes, it has convinced this Court that he violated DR 1–102(A)(4) and (5) because the evidence does meet the less strict clear and convincing evidence standard. We find that Kleindienst either knew or believed his statements to the State Bar concerning conversations about returning the funds to an Arizona bank were untrue.

### DISCIPLINE

■■■ The Disciplinary Board recommended that Kleindienst be suspended from the practice of law for one year. Discipline against an attorney has two purposes: (1) to protect the public from unethical attorneys; and (2) to deter other attorneys from engaging in unethical conduct. *In re Stout,* 122 Ariz. 503, 596 P.2d 29 (1979). The recommendation of the State Bar is entitled to serious consideration, *In re Moore,* 110 Ariz. 312, 518 P.2d 562 (1974); *In re Macdonald,* 56 Ariz. 120, 105 P.2d 1114 (1940). We have found true two counts of unethical conduct by Kleindienst. In addition, we have previously disciplined Kleindienst by censuring him in 1974. In the instant case, we believe the recommended discipline will serve its intended purposes.

Therefore, we order that Richard G. Kleindienst be suspended from the practice of law for one year to commence sixteen days from the date that this opinion is filed. Further, pursuant to Ariz.R.S.Ct. 37(g), Kleindienst, before he may be reinstated, is ordered to pay the costs and expenses of this proceeding to be determined by this Court.

HOLOHAN, C. J., and HAYS and CAMERON, JJ., concur.

FELDMAN, Justice, concurring in part, dissenting in part.

I concur with the finding that respondent violated DR 1–102(A)(4) and (5) and that he should be disciplined for these violations. I write to express my opinion that respondent has been treated too leniently. Considering the nature of these transactions and of respondent's past record, he should be disbarred.

I recognize that the recommendation of the State Bar is entitled to serious consideration and I would ordinarily not deviate from its recommendation. However, as the majority opinion points out, this court is the ultimate trier of both fact and law in disciplinary proceedings (*In re Moore,* 110 Ariz. 312, 313, 518 P.2d 562, 563 (1974)) and is also required to use its independent judgment in determining the discipline appropriate to the circumstances of each case. *In re Steward,* 96 Ariz. 49, 55, 391 P.2d 911, 915 (1964). In this case, I believe the Bar recommendation is too lenient because it has failed to consider respondent's participation in this entire transaction as part of the circumstances to be considered in imposing discipline. Further, both the Bar and the court have failed to give proper consideration to one of the prime purposes of disciplinary proceedings.

### THE INSURANCE FRAUD

There is considerable controversy with regard to just how deeply respondent was involved in the insurance scam which gave rise to these charges. He claims that he was a dupe and a tool rather than a perpetrator of fraud, but an examination of the record makes it impossible to accept that contention in toto. True, the evidence is not clear and convincing that respondent had precise knowledge of the encumbrance on the funds which were being transferred

---

despite his denial that he never had such a discussion.

**7.** Counsel for the State Bar points out that the jury in the criminal trial did not hear evidence

relating to Kleindienst's receipt of the $125,000 fee for a few hours of work. This evidence is important because it sheds light on Kleindienst's motive to conceal the truth.

back into Family Provider's name. For that reason, the court properly finds that the violations of Counts 2 and 6 have not been proven.

Beyond question, however, respondent did know quite a bit about what was happening. Taking the evidence in a light most favorable to him, respondent did know that he had been paid one-half of a $250,000 fee in order to influence Frank Fitzsimmons, the Teamsters President, to place the Teamsters Welfare Fund's group life insurance policy with a company called Old Security, rather than with the Prudential. In the course of this "work," respondent learned that while initially he had been "retained" to work for and help Old Security get the insurance business, he had actually been working for Great Pacific, the parent of Family Provider which was to be the alleged reinsurer for Old Security. Thus, at the time his "fee" was paid, respondent knew that he had been given $125,000 for five hours' work in using his influence to get the president of the union to "persuade" the officers of the union's welfare fund to place the fund's business with Old Security, which was then going to reinsure with Family Provider. Respondent then learned that Family Provider had written no business of any kind for some time. Respondent learned soon after that his client's subsidiary, Family Provider (the alleged reinsurer) had suddenly come into a great deal of money. Since respondent knew from the inquiries of the Arizona Insurance Department that Family Provider had no other income, he must have known that at best this money had to be the reinsurance premium on the Teamsters' deal. He then learned that Family Provider had declared a dividend in almost the same amount to its parent and his new client (Great Pacific), which was using the money in an attempt to buy the assets of another insurance company (GALICO), which had no relationship whatsoever to the business being written. Family Provider would thus be left with no funds or reserves for payment of the reinsurance claims.

Respondent had all this information by the time of the hearing before the insurance department. It never seems to have occurred to respondent that a lawyer ought to question the ethical propriety of these transactions and, if unsatisfied about the answers, ought at least to withdraw. See DR 7–102. These questions did occur to the lawyers who had initially incorporated Family Provider and who, with much less knowledge than respondent, were able to suspect something wrong. These lawyers started asking questions, and, when the answers were not satisfactory, decided that they wanted no part of helping this scheme to fruition. They were persuaded to stay in the matter by assurances from respondent.

Not only did respondent persuade the other counsel not to withdraw, but he allayed some of the suspicions of the Director of Insurance by saying at the hearing that he, Kleindienst, would personally see to it that when Family Provider got the funds back it would not again expend them without notice or approval of the Director of Insurance, but would maintain reserves for payment of claims. After making that assurance, respondent did nothing further and, in fact, the funds disappeared again after the hearings were concluded. The record of respondent's activities in this entire matter constitutes a *tour de force* of ethical legerdemain. Through it all, respondent maintained steadfastly that he had no knowledge that anything wrong was being done because he relied upon Hauser, and saw nothing untoward in the transactions. Respondent seems to have been alone in this conclusion.

The record establishes that respondent attempted to walk the line between ethical practice and participation in a scam; that he had much to gain and therefore sought to hear no evil, see no evil and speak no evil. As with most who attempt to walk such a fine line, he fell off on the wrong side of the divide and eventually gave false testimony under oath.

This alone warrants imposing severe punishment. However, we must remember that only two or three years before he became involved in the insurance scam, re-

spondent was censured by this court for having become involved in similar problems.[1]

### THE PAST RECORD

On March 16, 1974, in United States District Court, respondent entered a plea of guilty to violation of 2 U.S.C.A. § 192 (1938), thereby admitting that he had knowingly failed to give accurate and complete answers to questions propounded to him while he was testifying under oath before the Senate Judiciary Committee at hearings which involved respondent's confirmation as Attorney General of the United States. In October of 1974, in disciplinary proceedings which arose from that plea, the Arizona State Bar Board of Governors found that Kleindienst had knowingly given inaccurate, evasive or incomplete answers under oath to four series of questions involving the litigation between the United States and International Telephone and Telegraph (ITT).

In the proceedings now before us, respondent has attempted to make light of his past record. It is not so easily to be dismissed, and our rules permit us to consider it.[2]

In the various bar proceedings[3] which arose from respondent's testimony about the ITT cases, it was concluded that Mr. Kleindienst had failed to disclose and had misrepresented the facts while testifying under oath at the Senate hearings. Because his actions had not been taken for personal gain and he had eventually refused to follow the President's direct order, he was merely censured for his lack of com-plete truthfulness. We make witnesses swear that they will tell "the truth, the whole truth and nothing but the truth," and when they fail to do so, we charge them with perjury. Here we have a lawyer who, by his own admission, had failed to tell the "whole truth" and who received only a censure because he had not committed the wrongful act for his own personal gain. That mild, lenient treatment seems not to have made any impression on respondent, for only two years after that censure, he became involved in the insurance scam with the result that he again failed to tell "the truth, the whole truth and nothing but the truth" while under oath.

### THE PURPOSE OF DISCIPLINE IN THIS CASE—MAINTENANCE OF THE INTEGRITY OF THE PROFESSION

If, as the court finds—and I concur in the finding—there is clear and convincing evidence of perjury, then despite the jury acquittal, we must assume that respondent did commit the act of perjury and impose proper discipline for that act. Of all the offenses which a lawyer can commit, untruthfulness in judicial proceedings is one of the most egregious. Lawyers are required to be truthful in their practice even when not under oath. See DR 7–102(A)(3) through (7); Fabrication or Suppression of Evidence as Ground of Disciplinary Action Against Attorney, Annot. 40 A.L.R.3d 169 (1971). It is even worse when a man who has been Attorney General of the United States, and whose conduct should therefore be an example to the public and all other lawyers, commits these violations.

1. *In the Matter of a Member of the State Bar of Arizona, Richard G. Kleindienst*, No. SB–60 (Sup.Ct.Ariz.1974).

2. Rule 38(a), Rules of the Supreme Court, 17A A.R.S.

3. The factual background of the ITT case is contained in the reports of the Arizona State Bar Board of Governors, on file in *In re Kleindienst*, supra, and the Hearing Committee of the District of Columbia Bar, referred to in *District of Columbia Bar v. Kleindienst*, 345 A.2d 146 (D.C.App.1975). In the District of Columbia proceedings, Kleindienst was sus-pended for thirty days for violations of DR 1–102(A)(4), "by virtue of misrepresentations and dishonest conduct prejudicial to the administration of justice." This finding was grounded on Kleindienst's "direct and repeated misrepresentations in answering persistent inquiries about White House involvement in Justice Department litigation against ITT." 345 A.2d at 146. The District of Columbia Bar had recommended a one-year suspension, but, in part because Arizona had only imposed censure, a majority of the court reduced the suspension to 30 days.

Had there been no past record, I might still feel that a one-year suspension for perjury was too lenient. We have imposed worse to protect the public against lawyers who have done much less.[4] When perjury has been accompanied by at least some degree of knowing participation in a fraud and when we add to this the fact that only two years before respondent had received lenient treatment for conduct which was, at best, close to perjury, we may legitimately conclude that we are dealing with a man who certainly did not learn his lesson from the first discipline. The record before us, which contains neither a word of contrition nor any acknowledgment of wrongdoing from respondent, must raise doubt on the question of whether respondent has learned his lesson even now. To show further leniency by suspending respondent for only one year would be tantamount to recognizing, if not legitimizing, the idea that members of this profession may with relative impunity obfuscate the facts, conceal the truth, close their eyes to fraudulent schemes which they help bring to fruition, split fees, peddle influence, and lie under oath. This is conduct which in the most fundamental manner "adversely reflects on his fitness to practice law." DR 1–102(A)(6).

The majority holds that the purpose of discipline is not punishment, but, rather, protection of the public from the offender and deterrence of others. The one-year suspension may or may not satisfy these purposes. No doubt it will have a serious practical effect on respondent's future ability to practice law successfully. However, it will not serve another purpose, which I think is of equal importance to those mentioned in the majority opinion.

Over the years, . . . court decisions, while reaffirming the breadth of discretion, have nevertheless focused on a few salient considerations in determining the appropriate punishment in disciplinary proceedings. *These are principally: the maintenance of the integrity of the profession in the eyes of the public,* the protection of the public from unethical or incompetent lawyers, the deterrence of other lawyers from engaging in unprofessional conduct . . . .

*District of Columbia Bar v. Richard G. Kleindienst,* 345 A.2d at 150 (quoting Hearing Committee Number Three, Report to Disciplinary Board, Bar Docket No. 3–74B at 23) (emphasis added).

The kind of conduct in which respondent has engaged is not worthy of comparison to the practice of law by the vast majority of lawyers who work hard, attempting to the best of their abilities to advance and represent the interests of their clients in a legitimate, ethical and professional manner. The Bar and this court should do more than administer another slap on the wrist to respondent. He should be disbarred, thereby making it clear to the public that this court and the profession as a whole recognize and will maintain the distinction between the practice of law and the practice of anything you can get away with. There are already too many people (and some lawyers) who believe that a good lawyer is one who can produce results through chicanery, deceit, fraud and sharp practice. We cannot "maintain the dignity of the profession in the eyes of the public"—and of the Bar—unless we make it clear that they are wrong.

---

4. *See, e.g., In re Egan,* 127 Ariz. 105, 618 P.2d 599 (1980) (negligently failing to pursue client's claim with the result that default judgment was entered, resulting in one year's suspension); *In re Stout,* 122 Ariz. 503, 596 P.2d 29 (1979) (indefinite suspension for failing to pursue client's interest where lawyer failed to do so because of mental problems); *In re Wetzel,* 118 Ariz. 33, 574 P.2d 826 (1978) (indefinite suspension for filing malicious, unmeritorious fee collection actions); *In re Kastensmith,* 104 Ariz. 390, 453 P.2d 961 (1969) (two years' suspension for misrepresenting to clients that complaints had been filed when in fact they had not).