691 P.2d 1063

**In the Matter of a Member of the State Bar of Arizona, Manfred Rolland WETZEL, Respondent.**

No. SB–112–3.

State Bar Nos. 82–1–5A to 82–3–5A, 83–1–5A and 83–2–5A.

Supreme Court of Arizona, In Banc.

Aug. 8, 1984.

Certiorari Denied Feb. 19, 1985. See 105 S.Ct. 1184.

Leonard W. Copple, Tempe, Martha McConnell Bush, Phoenix, for the State Bar.

Robert A. Chard, Phoenix, for respondent.

Manfred R. Wetzel, pro se.

PER CURIAM:

It is with sadness and disappointment that we order the disbarment of Manfred R. Wetzel. The record reveals that Wetzel has not abandoned the tactics and unprofessional conduct that led to his prior suspension. *See Matter of Wetzel*, 118 Ariz. 33, 574 P.2d 826 (1978). Indeed, he has persisted in filing unfounded claims in order to harass and extort and has engaged in deceitful conduct in dealings with his colleagues and the courts. The evidence is clear and convincing that Wetzel has abused the right to practice law in this state and that the public interest requires that his license to practice be revoked.

■ When disciplinary action is recommended against an attorney, it is this Court's duty to make an independent determination of the facts. *Matter of Swartz*, 141 Ariz. 266, 686 P.2d 1236 (1984); *Matter of Burns*, 139 Ariz. 487, 679 P.2d 510 (1984), quoting *Matter of Lurie*, 113 Ariz. 95, 546 P.2d 1126 (1976). We do, however, give serious consideration to the findings and recommendations of the local administrative committee, *see* Ariz.R.S.Ct. 33–35, (hereinafter cited as "Rule"), and to the recommendations of the State Bar Disciplinary Board, *see* Rule 36, unless our review of the prior proceedings reveals that error has been committed which has resulted or

will result in a miscarriage of justice. Rule 38(b). Respondent has challenged the propriety of the prior proceedings as violating his right to due process and as involving impermissible conflicts of interest between himself and Donald W. Hart, Chairman of Local Administrative Committee 5A ("Committee"), and between himself and Leonard Copple, bar counsel. The gravity of these proceedings requires our careful consideration of his allegations.

## DUE PROCESS

The proceedings brought against respondent arose out of five complaints filed with the State Bar of Arizona. Respondent had notice of each complaint as it was filed and he submitted a written response to each. The five complaints were consolidated on January 7, 1983. In a letter dated January 11, 1983, respondent acknowledged receipt of notice of consolidation.

On April 13, 1983, a formal complaint summarizing each of eleven claims against respondent was issued by the Committee. The following day, a copy of the complaint and notice of a disciplinary hearing scheduled for May 19, 1983 were personally served on respondent. On May 17, respondent's attorney requested a ten-day continuance "to familiarize himself with the allegations." On May 18, the request was denied. On May 19, respondent's attorney filed a Petition for Special Action with this Court requesting a stay of the proceedings before the Committee. The petition was denied the same day.

When the Committee convened on May 19, counsel for respondent renewed his request for a continuance, asking for thirty days rather than for the ten days initially sought. The renewed motion was denied. Bar counsel commenced presentation of his case. Respondent's attorney made a continuing objection and stood mute throughout the proceedings on May 19 and May 20. He did not cross-examine witnesses or object to evidence. When bar counsel rested, respondent's counsel declined to offer a defense. Mr. Hart informed respondent and his attorney that the Committee would

recess until May 31, 1983 to give them an opportunity to prepare a defense and present it to the Committee. He told them that he would re-subpoena any witness who had already appeared and that the Committee would consider requests to facilitate preparation. Counsel for respondent stated that ten days was inadequate.

On May 27, counsel for respondent filed an Amended Petition for Special Action, once again requesting an interlocutory stay. The stay was denied and the amended petition dismissed as moot. When the proceedings reconvened on May 31, 1983, respondent reasserted his objections to the proceedings and, once again, stood mute.

Respondent's claim that he was denied adequate notice and an opportunity to be heard is without merit. In urging a continuance, respondent's counsel focused on the fact that respondent had been unable to secure counsel until six days before the date scheduled for the hearing. He claimed the delay in obtaining counsel, attributable to something other than delay on respondent's part, precluded him from preparing for the hearing and that respondent was, therefore, denied due process. This argument is based on a presumption that a respondent in disciplinary proceedings is entitled to representation by counsel. This presumption is simply not true. Though a respondent *may* be represented by counsel, he or she is not *entitled* to such representation. Had respondent been unable to obtain counsel any time prior to May 19, he would nonetheless have been expected to appear before the Committee or been deemed to have waived his right to do so. Respondent was entitled to "fair notice of the charge," *Matter of Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, 122 (1968). *See also Matter of Swartz*, 129 Ariz. 288, 630 P.2d 1020 (1981). He was not entitled to "whatever time was necessary" to acquire counsel and allow counsel to prepare for the hearing.

Respondent clearly had "fair notice of the charge." He had been informed of and responded in writing to each complaint against him as it was filed with the bar.

Even if he hoped the State Bar would not proceed on the complaints, he could not reasonably have maintained that hope after receiving the formal complaint and the notice of the disciplinary hearing. The record is devoid of anything that would suggest respondent did anything to prepare for the hearing from the time he received notice to the time he was to appear. Respondent could have, and indeed should have, begun to prepare any defense he wished to pursue. His decision to forego preparation in the hope of securing counsel to do all the necessary investigation and preparation was, at best, a decision which made retained counsel's task a very difficult one and, at worst, an attempt to delay the proceedings. Having sat on his hands and then having elected to stand mute, respondent cannot now claim that he was denied fair notice and an opportunity to prepare and present a defense. The Committee did not err in denying respondent's requests for a continuance.[1]

## CONFLICTS OF INTEREST

Respondent's second and third challenges to the proceedings involve conflicts of interest between himself and Mr. Hart, Chairman of the Committee, and between himself and Mr. Copple, bar counsel.

### Challenge to Mr. Hart

■ In a letter dated January 11, 1983, respondent asked Mr. Hart to withdraw from the Committee. He wrote, "If you will discuss the matter with Mr. Craig R. Kepner, the reasons will become obvious to you. If not, I refer you and Mr. Kepner to cause ICA No. 409–56–5921, IC No. WC 81–93080–W." By letter dated January 14, 1983, Mr. Hart denied the request that he withdraw. He stated that he was capable of exercising impartial judgment in the disciplinary matter. At the May 19, 1983 hearing, respondent's counsel renewed the request and presented one page of typed

transcript alleged to be an excerpt from an Industrial Commission case in which Mr. Kepner had stated:

"Your Honor, I take exception to [respondent], here, who has suggested that I tampered with the witnesses. I am Counsel of record in this case, and have a perfect right to meet and discuss with witnesses and my client their testimony at any hearing or any court proceeding. For Counsel to suggest that is wholly improper and the Counsel's record before the Bar in the State of Arizona ought to reflect his ability to practice law in this state."

Respondent's counsel claimed this statement demonstrated a bias against respondent on the part of Mr. Kepner and, by association, on the part of Mr. Hart because Mr. Hart and Mr. Kepner were partners of the same law firm. This connection, respondent's counsel maintained, created a conflict of interest which made it inappropriate for Mr. Hart to serve as chairman of the Committee in the instant proceedings. Respondent's counsel renewed the request that Mr. Hart withdraw. It was denied.

Respondent's counsel repeated the request a third time at the May 31, 1983 hearing. In response, Mr. Hart stated that he had neither participated in the workmen's compensation hearing nor been aware of it before the challenge was made. After respondent's counsel agreed that the workmen's compensation hearing bore no relationship to any charge in the bar proceeding, Mr. Hart absented himself to permit the other two members of the Committee to consider the challenge once more. The Committee members denied the request. We find no error.

In his opening brief, respondent cites *State v. Latique,* 108 Ariz. 521, 502 P.2d 1340 (1972) and *Rodriguez v. State,* 129 Ariz. 67, 628 P.2d 950 (1981) in support of

---

1. The Committee's decision to give respondent ten days to prepare a defense after the bar had presented its case was irregular. However, it was nothing more or less than an effort by the Committee to accommodate respondent and his counsel by giving them more than the rules require so that they might defend against the charges. In doing so, the Committee accorded respondent more process than was due.

his claim that Mr. Hart's participation cast an impermissible taint on the proceedings. Respondent does not claim Mr. Kepner or Mr. Hart were privy to any confidential information; the challenge is based solely on an appearance of impropriety. A.B.A. Model Code of Professional Responsibility, Canon 9 (1980).

The cases cited are inapposite as they involve conflicts and disqualifications arising out of prior or current representations. In *Latigue*, this Court held that when a deputy public defender who had acted as co-counsel for a particular defendant became chief deputy county attorney, no county attorney of that office could prosecute that defendant because the public might believe the defendant's former co-counsel had revealed to his new colleagues confidential information obtained during the prior representation. We held that such an appearance of impropriety must be avoided. In *Rodriguez*, this Court held that all Maricopa County Public Defenders should have been disqualified from representing a particular defendant based on the appearance of impropriety when his public defender, though not privy to any confidential information gained from a second defendant represented by that office, recognized that to zealously represent his client he would have to call the second defendant in order to cast doubt on the guilt of his client.

In discussing the appearance of impropriety in relation to the doctrine of "vicarious liability," we stated:

> "Under the view imputing knowledge of one attorney to others, attorneys and partnerships are generally disqualified by reason of disqualification of an attorney associated with them *either on the basis of representation of an adverse interest or the possible disclosure of confidential information.*"

*Rodriguez, supra,* at 73, 628 P.2d at 956 (emphasis added). In the instant case, there was no prior or current representation by Mr. Kepner or Mr. Hart that would have made them privy to any information about respondent that would or could have

been used to his detriment in the disciplinary proceeding. Nor was there any prior or current representation of adverse interests. Indeed, the workmen's compensation case bore no relation whatsoever to the disciplinary proceeding. We find no conflict of interest here.

### Challenge To Mr. Copple

At the May 31, 1983 hearing, respondent challenged the participation of Mr. Copple, bar counsel, based on an alleged conflict of interest arising out of bar counsel's brother's partnership interest in a law firm that had represented respondent in a civil matter. *See Nienstedt v. Wetzel,* 133 Ariz. 348, 651 P.2d 876 (App.1982). In response to the challenge, bar counsel stated that when he learned of the law firm's prior representation, some months after he had been appointed bar counsel, he had called his brother, Steven D. Copple, to inquire about his brother's connection with the case. His brother informed him that he knew only what he had read in the published opinion. Bar counsel informed the Committee, on the record, that Steven had not represented respondent, that Steven had not, to the best of his recollection and the recollection of the lawyers who had represented respondent, ever discussed the case with them, and that bar counsel personally had never discussed the case with Steven. After conferring on the issue, the Committee rejected respondent's challenge.

■ The question before us is whether a conflict of interest exists when the sibling of a partner in a law firm that represented a person in a civil case is appointed several years later as bar counsel in disciplinary proceedings brought against the person. We find the relationship described too remote to constitute a conflict of interest that would warrant disqualification. The situation falls beyond the scope of the "vicarious liability" doctrine as the Copple brothers are not partners in the practice of law. The fact that they are siblings does not necessitate disqualification. We agree with the Georgia Supreme Court that "[b]asic fairness will not permit the dis-

qualification of an attorney because of wrongdoing imputed to the attorney by reason of his status when as a matter of fact no wrongdoing exists." *Blumenfeld v. Borenstein*, 247 Ga. 406, 408, 276 S.E.2d 607, 609 (1981) (disqualification of counsel based solely on marital status).

Further, the record before us shows that no disclosure of confidences could have occurred. Though the Nienstedt case was relevant to the disciplinary proceeding as several charges against respondent grew out of it, the evidence before the Committee on those charges came from two sources, neither of which could possibly have revealed any confidential communications from respondent to bar counsel's brother's law firm. One source was the court file in the case which is a matter of public record. The second was the testimony of opposing counsel who testified to the chronology of events in the case. Neither of these sources offered opportunity to reveal any confidential information.

The proceedings before the Committee and the Disciplinary Board were conducted in compliance with the rules and afforded respondent due process. Therefore, the findings and recommendations of both tribunals will be given serious consideration.

## DISBARMENT

■ In February 1978, when this Court ordered that respondent be indefinitely suspended from the practice of law, we said:

"It is apparent that, throughout the past few years, respondent has been incapable of conducting relationships with many of his clients in a completely professional manner. While the record does not clarify whether this incapacity results from respondent's ignorance of certain rules governing the conduct of attorneys in Arizona, or from his emotional inability or philosophical unwillingness to adjust his conduct accordingly, his conduct and attitudes demonstrate that he is currently unfit to practice law."

*Wetzel, supra,* 118 Ariz. at 36, 574 P.2d at 829. In this case the Committee made twenty-six findings of fact and twenty-four conclusions of law and recommended that respondent be disbarred. After a hearing at which respondent's newly-hired counsel [2] reasserted each of the three challenges discussed above and respondent responded to several of the charges against him, the Disciplinary Board voted unanimously to adopt the Committee's findings of fact, conclusions of law, and recommendation that respondent be disbarred. Having read the record and heard respondent's argument, we adopt the Committee's findings as our own and conclude that respondent is unable or unwilling to operate within the confines of the law and to conduct himself in a professional manner. He is therefore unfit to practice law.

In the interest of brevity we will not repeat all the findings and conclusions of the Committee. Instead we will focus on those charges that demonstrate that respondent must be disbarred to protect the public and to deter other attorneys from engaging in the same sort of unethical conduct that respondent refuses to abandon.[3] *See Burns, supra; Matter of Kleindienst,* 132 Ariz. 95, 644 P.2d 249 (1982).

### Repetition of Previous Unethical Tactics

Respondent was previously suspended in part based on our finding that he had raised a doubtful $20 claim to $75 and had requested punitive damages in order to bring the claim in superior court and to intimidate and harass the "client" from whom he sought payment. We found that, in doing so, respondent had violated Rule

---

2. On June 16, 1983, respondent's counsel before the Committee was permitted to withdraw due to "irreconcilable differences." New counsel was substituted. Thereafter, respondent blamed prior counsel for failing to present a defense at the hearing stating, in essence, that prior counsel did not know what he was doing.

3. Respondent's claim that the Committee erred when it considered his prior suspension in the course of recommending discipline at this time is without merit. *See* Rule 38(a)(4).

29(a), DR 2–109(A)(1) and DR 7–102(A)(1) (hereinafter cited as "DR"). *See Wetzel, supra.* Since his readmission to the bar, respondent has employed one or both of these unethical tactics in representation of a client against a department store, in *pro se* representation against his former attorney, and in dealing with a client seeking a divorce. The facts relevant to this conclusion follow.

## A. The Buckley case

On April 28, 1981, Joan Buckley filed a complaint on her own behalf in West Mesa Justice Court against Montgomery Ward & Co. ("Wards") seeking damages in the amount of $1,890.04. This was the amount she believed she was entitled to recover for Wards' failure to repair her car as promised. Shortly thereafter, she entered into an oral contract with respondent in which he agreed to handle her case on a one-third contingency fee, plus costs, basis. On July 14, 1981, Ms. Buckley's Justice Court complaint was dismissed by stipulation. In late August, respondent filed a complaint in superior court on the same cause of action seeking compensatory damages of $50,000 on each of three claims and punitive damages in an unspecified amount. Ms. Buckley did not see the superior court complaint until after summary judgment was entered against her.

On January 13, 1982, attorney's fees of $75 were awarded against Ms. Buckley for failure to answer interrogatories. Ms. Buckley had received the interrogatories from respondent in late 1981 and had returned them, answered to the best of her ability, less than one week later. Ms. Buckley was not aware that sanctions had been sought against her until after they were granted by the court.

Respondent then presented Ms. Buckley with a written retainer agreement providing for one-half contingency fee on all amounts collected from Wards. Ms. Buckley refused to sign. Respondent later threatened to lose or drop the case if she would not sign a consent to his withdrawal as attorney of record. Subsequently, summary judgment was granted in favor of

Wards. At that point Ms. Buckley signed the consent to withdraw and hired another attorney to file an appeal. To the date of the disciplinary hearing, respondent had refused to deliver his file on the matter to Ms. Buckley or her new attorney.

Respondent's conduct was improper in several respects. In boosting the damage claim as he did so that he could file Ms. Buckley's claim in superior court and attempt to extort a settlement from Wards, respondent violated DR 7–102(A)(1) and (2). In handling the matter entrusted to him as he did and in dealing with his client as he did, respondent violated DR 1–102(A)(4), (5), and (6), DR 2–110(A)(2), and DR 6–101(A)(2) and (3) and opened himself to discipline under Rule 29(b).

## B. The Welliever case

Respondent's inability to recognize that it is inappropriate to raise the value of claims to create jurisdiction in a particular forum or to intimidate an opponent is further demonstrated in his dispute with Robert Welliever, the attorney who represented him in his successful motion for readmission to the bar. Welliever brought an action against respondent for payment of $2,050 due on the retainer agreement. In response, respondent threatened to file a counterclaim against Welliever and his partners if they pursued the action against him. When Welliever declined to forego the claim, respondent filed a counterclaim claiming damages of $90,000 arising out of Welliever's alleged "procrastination" in achieving respondent's readmission. The counterclaim was dismissed on a motion for summary judgment.

Shortly before trial on Welliever's complaint, respondent filed an amended counterclaim alleging the same conduct stated in the original counterclaim. He claimed the same damages but sought relief only in the amount of $4,999. At the time the amended counterclaim was filed, there was no counterclaim pending in the case to amend and no motion to file an amended or second counterclaim had been filed by respondent. The amended counterclaim was

dismissed. In a memorandum decision, the Court of Appeals approved the dismissal.

Respondent's conduct with respect to Welliever reflects two things. First, respondent has not learned that it is inappropriate to file highly exaggerated claims to achieve his ends. When asked about the $90,000 figure at oral argument, respondent said it was compensation for a $12,000 advertisement in the Yellow Pages, for the loss of the opportunity to take advantage of a favorable lease offer, and for the loss of business that resulted from Welliever's procrastination. The half-page advertisement had been taken prior to the hearing for readmission to the bar and some four months prior to our decision to readmit. Without commenting on the propriety of respondent's confident anticipation that he would be readmitted, we find the amount demanded, coupled as it was with threats to Welliever and his partners and the subsequent almost 95% reduction in the alleged damages, was made to harass and intimidate. Second, respondent's conduct in the dispute manifests his unwillingness or inability to acknowledge judicial decisions against him. Respondent's counterclaim and "amended" counterclaim were dismissed by the trial court. Though the Court of Appeals has approved the trial court's dismissal of the "amended" counterclaim, respondent believes it is still viable and has indicated his intent to pursue it.

In dealing with Mr. Welliever as he did, respondent violated DR 1–102(A)(4), (5), and (6) and DR 2–109(A)(1) and (2); in handling his defense as he did, respondent violated DR 7–102(A)(1), (2), (5), and (8). Most significantly, respondent engaged in the type of conduct for which he was suspended in 1978.

### Other Unethical Tactics With Clients

Respondent's conduct in connection with the proposed adoption of a child and the handling of a divorce compel the conclusion that the public must be protected from further representation by him. *Kleindienst, supra; Burns, supra.*

### A. The Rose Case

In April or May of 1981, Pamela and Arthur Rose contacted respondent to seek his help in adopting a child. He informed them that the adoption of a particular soon-to-be-born child would cost $2,500. Fifteen hundred dollars was for the legal work and court appearances of another attorney and the remaining $1,000 was for his services in "placing the baby in a Christian home." Although the medical expenses of the natural mother were to be paid by insurance, respondent advised the Roses that they would be responsible for additional reimbursement to the mother for those expenses. When the Roses refused to pay any fees without assurances that they were legal and without the signed consent of the natural mother, respondent told them they were not qualified to adopt the child. The Roses filed a complaint with the State Bar in November of 1981.

It is precisely this type of "baby selling" that the Legislature has sought to prevent. In requesting fees for placing a child in the Roses' care, respondent violated A.R.S. § 8–126(C) ("No person * * * shall request * * * any compensation or thing of value, directly or indirectly, for placing out of a child [for adoption]."). Had the Roses yielded to his unlawful request for payment, he would have violated A.R.S. § 8–126(D) as well. In acting as he did, respondent violated DR 1–102(A)(4), (5), and (6) and opened himself to discipline under Rule 29(b).

### B. The Stormberg Case

During the period in which respondent was negotiating with the Roses, he agreed to represent Connie Stormberg in an uncontested divorce for a fee of $180.00 plus court costs. At their first meeting, Ms. Stormberg paid respondent $180.00. The following day, she and her husband met with respondent and provided him with an agreed-upon division of their property; Ms. Stormberg informed him that she would contact him when she was ready to proceed with the divorce. Later, she informed him that she was ready. Shortly thereafter respondent informed her that a hearing

had been set for September. He later informed her that the September hearing had been cancelled and rescheduled for October 7, 1981. Sometime prior to October 7, respondent informed her that the October hearing had also been cancelled. Respondent provided no explanation for either cancellation. At that time, respondent also told her there would be additional attorney's fees for his work because Mr. Stormberg was opposing the divorce. Ms. Stormberg had maintained amicable relations with her husband and knew he was cooperating fully. The Stormbergs consulted another attorney.

On October 30, Ms. Stormberg fired respondent. Shortly thereafter, she received a bill from him for over $300.00. On November 25, 1981, she filed a complaint with the State Bar. In defense to her complaint, respondent submitted an itemized bill totaling $424.25 and included charges for counseling. Ms. Stormberg testified at the hearing that she and her husband had neither sought nor participated in counseling with respondent. She further stated that the $300 bill she received was not for court costs.

■ When counsel agrees to provide legal services for a set fee, he is expected to provide the agreed-upon service for the agreed-upon fee. Furthermore, as we have tried to impress upon respondent, retaliation against a client is improper. In handling Ms. Stormberg's case as he did, respondent violated DR 1–102(A)(4), (5), and (6) and DR 6–101(A)(3).

In connection with this matter, we must point out one more instance of improper conduct. Upon commencing his oral presentation to this Court on May 30, 1984, respondent submitted a "Second Supplemental Reply Brief" to each Justice. At the close of his rebuttal, as he was about to sit down, respondent informed the Court that the brief consisted of an "affidavit" that had yet to be signed by the presumed affiant, Mr. Stormberg. Explaining that the signed original had been delayed in the mail and was on its way, respondent requested permission to file the original

when received. To this date, the original has not been filed.

■ An "affidavit" is a signed, written statement, made under oath before an officer authorized to administer an oath or affirmation in which the affiant vouches that what is stated is true. *Otani v. District Court in and for Twenty-First Judicial District,* 662 P.2d 1088 (Colo.1983); *Halsey v. Pat Reichenberger Lumber, Inc.,* 5 Kan.App.2d 622, 621 P.2d 1021 (1981); *Mountain States Resources, Inc. v. Ehlert,* 636 P.2d 868 (Mont.1981). What respondent submitted was not an affidavit; it was simply the statement to which he hoped Mr. Stormberg would attest. Though there may be some circumstances under which we would accept such a statement, this is not one of them. Respondent's failure to file a true affidavit does not warrant any special consideration. Respondent's action, in filing the statement and presenting it to this Court as he did, was, at best, conduct unbefitting a lawyer, *see* Rule 29(b)(9), and, at worst, an attempt to perpetrate a fraud on this Court.

### Unethical Tactics With The Bar and The Courts

Finally, we find that respondent deceived his colleagues and the state courts in other instances in order to achieve his ends. Such conduct alone warrants disbarment.

#### A. Tape-recording conversations

Respondent admitted to charges that he surreptitiously tape-recorded conversations with Mr. Welliever, Tom Druken, a staff examiner for the State Bar of Arizona who was investigating the complaints filed against respondent, and Mark Harrison, opposing counsel in one of respondent's case. Respondent recorded these people "to protect [him]self from liars." In an affidavit submitted to the Disciplinary Board, he stated:

"I did tape-record Mr. Welliever because he had lied to me, had made threats, threatened that I would have trouble with the Bar caused by him, had caused me damage by missing hearing

dates and abusing my case, and then he had tried to extort money out of me when he had already been paid in full. * * *

"I didn't know if [Mr. Druken] was from the Bar or not and recorded him to have a record and to protect myself from any further lying or the tactics of Mr. Welliever who, it was obvious in my mind, was using and influencing the State Bar to carry out his personal vendetta and in trying to steal money from me.

"Mr. Welliever was not only a perjurer but he was a man from whom I needed protection, to wit, an accurate record of his threats and lying.

\*      \*      \*      \*      \*      \*

"Mr. Harrison tried to settle [a] personal injury case directly with [my client. My client] provided Mr. Harrison with a copy of my retainer agreement with [him]. Mr. Harrison was not going to honor that retainer agreement. When Mr. Harrison called me and told me these things, I recorded Mr. Harrison * * *. Mr. Harrison told [the attorney representing the Nienstedts] that he (Mr. Harrison) was going to have me disbarred.

\*      \*      \*      \*      \*      \*

"I was acting within the guideline of the rules because I was protecting myself from Mr. Harrison."

He claimed his surreptitious taping was "acceptable" under guidelines set forth in Arizona Ethics Opinions No. 75–13 (1975). That opinion set forth very narrow exceptions to the general rule that it is improper for a lawyer to record any conversation without the consent or prior knowledge of all parties to the conversation. Respondent highlighted the following paragraph of that opinion:

"It * * * may be both necessary and proper for a lawyer to secretly record a conversation in order to protect himself, or his client, from harm that would result from perjured testimony. In this category, however, it is important to note that the purpose of the secret recording is solely to provide a shield for the lawyer, or his client, and that this exception does not authorize secret recordings for the purpose of obtaining impeachment evidence of inconsistent statements."

We are somewhat intrigued by respondent's reliance on this paragraph as it is precisely the paragraph which condemns his actions. By his own admission, the recordings were made in case it became necessary to impeach the statements of the unknowing speaker at a later date. In making these surreptitious tape recordings, respondent violated Arizona Ethics Opinion No. 75–13 (1975), DR 1–102(A)(4) and (6), DR 7–102(A)(8) and opened himself to discipline under Rule 29(b).

### B.   Manufactured Evidence

Perhaps respondent's most egregious misconduct involved his purposeful deception of the court in connection with *Nienstedt, supra.* Briefly, respondent informed the trial court that he possessed two tape-recorded telephone conversations with the Nienstedts that proved his allegations. The Nienstedt's attorney sought discovery of the tapes; respondent sought a protective order on the ground that the tapes contained answers to specifically structured questions and were, therefore, his privileged work product. The judge held the tapes to be discoverable and ordered respondent to produce them. At the time and place scheduled for disclosure, respondent admitted that the tapes were blank. Opposing counsel sought sanctions. The trial court found that respondent's conduct was willful and intentional, that his motions to prevent discovery were a sham, and that his actions constituted an abuse of process. The Court of Appeals upheld the trial court's findings.

In defense against the disciplinary charges arising out of the use of the blank tapes, respondent has submitted copies of three affidavits filed in *Nienstedt, supra.* In one, he offered two justifications for his conduct. He claimed, first, that he had submitted the blank tapes as a temporary measure because he had misplaced the actual tapes and had intended to

make the substitution when the actual tapes were found. Second, he claimed that eight attorneys, including his own, had advised him that submitting blank tapes for the purpose of "caus[ing] the Defendants to fear contradiction if they took liberties with the truth" was an acceptable tactic. He also noted that the tactic had been suggested and advocated by a speaker from the American Trial Lawyers Association in a seminar at the 1967 Arizona State Bar Convention. The other two affidavits were by attorneys consulted; they confirmed respondent's second claim. These justifications are neither compelling nor consistent. First, when counsel misplaces evidence, he is not entitled to submit a false substitute in its stead. Second, the fact that other members of the bar would use the deceitful practices respondent used does not alter the fact that they are unlawful and professionally improper. Had these attorneys employed the methods they encouraged respondent to use, they too would be subject to discipline. Finally, if respondent had actual tape recordings of conversations with the Nienstedts, he would have had no reason to consider the propriety of submitting blank tapes to keep them honest. Respondent's deceit before the trial court is without justification. In misleading the trial court as he did, respondent violated A.R.S. § 32–263(4) and could have been criminally prosecuted under § 32–265(1). He also violated DR 1–102(A)(4), DR 7–102(A)(5) and (8), and DR 7–106(C)(1) and opened himself to discipline under Rule 29(b).

## CONCLUSION

The evidence is clear and convincing that respondent's license to practice law must be revoked. He has shown that he is unwilling or unable to act within the confines of the law and professional ethics when it is not in his tactical, pecuniary, or personal interest to do so. He has been dishonest, if not malicious, in his dealings with clients, colleagues, and the courts of this state. His written and oral arguments are fraught with paranoia and distrust of anyone who disagrees with him. In a legal

system which relies on the integrity of lawyers to provide honest, forthright adversarial representation as a means to achieving truth and justice, we demand that members of the bar provide nothing less. The record and respondent's actions before this Court overwhelmingly establish that he lacks the "qualities of responsibility, candor, fairness, self-restraint, objectivity and respect for the judicial system which are necessary adjuncts to the orderly administration of justice." *Matter of Martin-Trigona,* 55 Ill.2d 301, 312, 302 N.E.2d 68, 74 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). *See Matter of Ronwin,* 139 Ariz. 576, 680 P.2d 107, *cert. denied,* — U.S. —, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983).

Manfred R. Wetzel is disbarred, effective immediately.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, CAMERON and FELDMAN, JJ., concur.